CANTOR, DBA SELDEN DRUGS CO. *v.* DETROIT
EDISON CO.

No. 75–122.  Argued January 14, 1976—Decided July 6, 1976

*Burton I. Weinstein* argued the cause for petitioner. With him on the briefs were *Robert A. Holstein, Michael L. Sklar,* and *David L. Nelson.*

*George D. Reycraft* argued the cause for respondent. With him on the brief were *Donald I. Baker, Leon S. Cohan,* and *Dean J. Landau.*

*Solicitor General Bork* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Assistant Attorney General Kauper, Barry Grossman,* and *Carl D. Lawson.*

*Howard J. Trienens* argued the cause for Michigan Bell Telephone Co. et al. as *amici curiae* urging affirmance. With him on the brief were *Theodore N. Miller* and *C. John Buresh.*\*

---

\**Sumner J. Katz* filed a brief for the National Association of Regulatory Utility Commissioners as *amicus curiae* urging affirmance.

MR. JUSTICE STEVENS delivered the opinion of the Court.†

In *Parker* v. *Brown,* 317 U. S. 341, the Court held that the Sherman Act was not violated by state action displacing competition in the marketing of raisins. In this case we must decide whether the *Parker* rationale immunizes private action which has been approved by a State and which must be continued while the state approval remains effective.

The Michigan Public Service Commission pervasively regulates the distribution of electricity within the State and also has given its approval to a marketing practice which has a substantial impact on the otherwise unregulated business of distributing electric light bulbs. Assuming, *arguendo,* that the approved practice has unreasonably restrained trade in the light-bulb market, the District Court [1] and the Court of Appeals [2] held, on the authority of *Parker,* that the Commission's approval exempted the practice from the federal antitrust laws. Because we questioned the applicability of *Parker* to this situation, we granted certiorari, 423 U. S. 821. We now reverse.

Petitioner, a retail druggist selling light bulbs, claims that respondent is using its monopoly power in the distribution of electricity to restrain competition in the sale of bulbs in violation of the Sherman Act.[3] Discovery

---

†Parts II and IV of this opinion are joined only by MR. JUSTICE BRENNAN, MR. JUSTICE WHITE, and MR. JUSTICE MARSHALL.

[1] 392 F. Supp. 1110 (ED Mich. 1974).

[2] 513 F. 2d 630 (CA6 1975).

[3] Petitioner's complaint asserts that respondent's light-bulb-exchange program violates § 2 of the Sherman Act, 15 U. S. C. § 2, and § 3 of the Clayton Act, 15 U. S. C. § 14. In his brief in this Court, petitioner has also argued that the program constitutes unlawful tying violative of § 1 of the Sherman Act. The complaint seeks treble damages and an injunction permanently enjoining

and argument in connection with defendant's motion for summary judgment were limited by stipulation to the issue raised by the Commission's approval of respondent's light-bulb-exchange program. We state only the facts pertinent to that issue and assume, without opining, that without such approval an antitrust violation would exist. To the extent that the facts are disputed, we must resolve doubts in favor of the petitioner since summary judgment was entered against him. We first describe respondent's "lamp exchange program," we next discuss the holding in *Parker* v. *Brown,* and then we consider whether that holding should be extended to cover this case. Finally, we comment briefly on additional authorities on which respondent relies.

I

Respondent, the Detroit Edison Co., distributes electricity and electric light bulbs to about five million people in southeastern Michigan. In this marketing area, respondent is the sole supplier of electricity, and supplies consumers with almost 50% of the standard-size light bulbs they use most frequently.[4] Customers are billed for the electricity they consume, but pay no separate charge for light bulbs. Respondent's rates, including the omission of any separate charge for bulbs, have been approved by the Michigan Public Service Commission, and may not be changed without the Commission's approval. Respondent must, therefore, con-

---

respondent from requiring the purchase of bulbs in connection with the sale of electrical energy. The complaint purports to be filed on behalf of all persons similarly situated, but the record contains no indication that the plaintiff moved for a class determination pursuant to Fed. Rule Civ. Proc. 23 (c).

[4] Respondent does not distribute fluorescent lights or high-intensity discharge lamps; if bulbs of those types were included, respondent's share of the market would only be about 23%.

tinue its lamp-exchange program until it files a new tariff and that new tariff is approved by the Commission.

Respondent, or a predecessor, has been following the practice of providing limited amounts of light bulbs to its customers without additional charge since 1886.[5] In 1909 the State of Michigan began regulation of electric utilities.[6] In 1916 the Michigan Public Service Commission first approved a tariff filed by respondent setting forth the lamp-supply program. Thereafter, the Commission's approval of respondent's tariffs has included implicit approval of the lamp-exchange program. In 1964 the Commission also approved respondent's decision to eliminate the program for large commercial customers.[7] The elimination of the service for such customers became effective as part of a general rate reduction for those customers.

In 1972 respondent provided its residential customers with 18,564,381 bulbs at a cost of $2,835,000.[8] In its accounting to the Michigan Public Service Commission, respondent included this amount as a portion of its cost of providing service to its customers. Respondent's accounting records reflect no direct profit as a result of the

---

[5] Under respondent's practice, new residential customers are provided with bulbs in "such quantities as may be needed" for all of their permanent fixtures; thereafter, respondent replaces residential customers' burned out light bulbs in proportion to their estimated use of electricity for lighting. The customer incurs no direct charge for such bulbs at the time they are furnished to him, but normally turns in any burned-out bulbs to obtain a new supply.

[6] See Mich. Comp. Laws §§ 460.551, 460.559 (1970).

[7] Apparently many commercial customers use relatively large quantities of fluorescent lighting and therefore have less interest in the bulb-exchange program.

[8] Of this amount, $2,363,328 was paid to the three principal manufacturers of bulbs from whom respondent made its purchases; the other $471,672 represented costs incurred in the use of respondent's personnel and facilities in carrying out the program.

distribution of bulbs. The purpose of the program, according to respondent's executives, is to increase the consumption of electricity. The effect of the program, according to petitioner, is to foreclose competition in a substantial segment of the light-bulb market.[9]

The distribution of electricity in Michigan is pervasively regulated by the Michigan Public Service Commission. A Michigan statute [10] vests the Commission with "complete power and jurisdiction to regulate all public utilities in the state . . . ." The statute confers express power on the Commission "to regulate all rates, fares, fees, charges, services, rules, conditions of service, and all other matters pertaining to the formation, operation, or direction of such public utilities." Respondent advises us that the heart of the Commission's function is to regulate the " 'furnishing . . . [of] electricity for the production of light, heat or power . . . .' " [11]

The distribution of electric light bulbs in Michigan is unregulated. The statute creating the Commission contains no direct reference to light bulbs. Nor, as far as we have been advised, does any other Michigan statute authorize the regulation of that business. Neither the Michigan Legislature, nor the Commission, has ever made any specific investigation of the desirability of a lamp-exchange program or of its possible effect on competition in the light-bulb market. Other utilities regulated by the Michigan Public Service Commission do not follow the practice of providing bulbs to their customers at no

---

[9] According to respondent the effect of the program is to save · consumers about $3 million a year, since the bulbs they now receive at a cost of $2,835,000 would cost them about $6 million in the retail market.

[10] Mich. Comp. Laws § 460.6 (1970).

[11] See Brief for Respondent 11; Mich. Comp. Laws § 460.501 (1970).

additional charge. The Commission's approval of respondent's decision to maintain such a program does not, therefore, implement any statewide policy relating to light bulbs. We infer that the State's policy is neutral on the question whether a utility should, or should not, have such a program.

Although there is no statute, Commission rule, or policy which would prevent respondent from abandoning the program merely by filing a new tariff providing for a proper adjustment in its rates, it is nevertheless apparent that while the existing tariff remains in effect, respondent may not abandon the program without violating a Commission order, and therefore without violating state law. It has, therefore, been permitted by the Commission to carry out the program, and also is required to continue to do so until an appropriate filing has been made and has received the approval of the Commission.

Petitioner has not named any public official as a party to this litigation and has made no claim that any representative of the State of Michigan has acted unlawfully.

## II

In *Parker* v. *Brown* the Court considered whether the Sherman Act applied to state action. The way the Sherman Act question was presented and argued in that case sheds significant light on the character of the state-action concept embraced by the *Parker* holding.

The plaintiff, Brown, was a producer and packer of raisins; the defendants were the California Director of Agriculture and other public officials charged by California statute with responsibility for administering a program for the marketing of the 1940 crop of raisins. The express purpose of the program was to restrict competition among the growers and maintain prices in the dis-

tribution of raisins to packers.[12] Nevertheless, in the District Court, Brown did not argue that the defendants had violated the Sherman Act. He sought an injunction against the enforcement of the program on the theory that it interfered with his constitutional right to engage in interstate commerce. Because he was attacking the constitutionality of a California statute and regulations having statewide applicability, a three-judge District Court was convened.[13] With one judge dissenting, the District Court held that the program violated the Commerce Clause and granted injunctive relief.[14]

The defendant state officials took a direct appeal to this Court. Probable jurisdiction was noted on April 6, 1942, and the Court heard oral argument on the Com-

---

[12] "The California Agricultural Prorate Act authorizes the establishment, through action of state officials, of programs for the marketing of agricultural commodities produced in the state, so as to restrict competition among the growers and maintain prices in the distribution of their commodities to packers. The declared purpose of the Act is to 'conserve the agricultural wealth of the State' and to 'prevent economic waste in the marketing of agricultural products' of the state." 317 U. S., at 346.

"The declared objective of the California Act is to prevent excessive supplies of agricultural commodities from 'adversely affecting' the market, and although the statute speaks in terms of 'economic stability' and 'agricultural waste' rather than of price, the evident purpose and effect of the regulation is to 'conserve agricultural wealth of the state' by raising and maintaining prices, but 'without permitting unreasonable profits to producers.' § 10." Id., at 355.

[13] Title 28 U. S. C. § 2281 has been consistently read by this Court as authorizing a three-judge court only when the state statute which is sought to be enjoined is of a general and statewide application. Moody v. Flowers, 387 U. S. 97, 101.

[14] Article I, § 8, cl. 3, of the United States Constitution provides: "Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes . . . ."

merce Clause issue on May 5, 1942. In the meantime, on April 27, 1942, the Court held that the State of Georgia is a "person" within the meaning of § 7 of the Sherman Act and therefore entitled to maintain an action for treble damages. *Georgia* v. *Evans,* 316 U. S. 159.

Presumably because the Court was then concerned with the relationship between the sovereign States and the antitrust laws, it immediately set *Parker* v. *Brown* for reargument [15] and, on its own motion, requested the Solicitor General of the United States to file a brief as *amicus curiae* and directed the parties to discuss the question whether the California statute was rendered invalid by the Sherman Act.[16]

In his supplemental brief the Attorney General of

---

[15] The Court also asked the parties to consider whether the Agricultural Adjustment Act, as amended, or any other Act of Congress, invalidated the California program. The supplemental briefs noted that the California program had been adopted with the collaboration of officials of the United States Department of Agriculture, and had been aided by loans from the Commodity Credit Corporation recommended by the Secretary of Agriculture. These facts were emphasized in portions of Mr. Chief Justice Stone's opinion discussing the Agricultural Adjustment Act and the Commerce Clause, see 317 U. S., at 357, 358–359, 368, but were not mentioned in connection with the Court's discussion of the Sherman Act.

[16] The first order entered in the Supreme Court Journal on Monday, May 11, 1942, provided:

"No. 1040. W. B. Parker, Director of Agriculture, et al., appellants, v. Porter L. Brown. This cause is restored to the docket for reargument on October 12 next. In their briefs and on the oral argument counsel for the parties are requested to discuss the questions whether the state statute involved is rendered invalid by the action of Congress in passing the Sherman Act, the Agricultural Adjustment Act as amended, or any other Act of Congress. The Solicitor General is requested to file a brief as *amicus curiae* and, if he so desires, to participate in the oral argument." Journal, O. T. 1941, p. 252.

California [17] advanced three arguments against using the Sherman Act as a basis for upholding the injunction entered by the District Court. He contended (1) that even though a State is a "person" entitled to maintain a treble-damage action as a plaintiff, Congress never intended to subject a sovereign State to the provisions of the Sherman Act; (2) that the California program did not, in any event, violate the federal statute; and (3) that since no evidence or argument pertaining to the Sherman Act had been offered or considered in the District Court, the injunction should not be sustained on an antitrust theory.[18]

In his brief for the United States as *amicus curiae,* the Solicitor General did not take issue with the appellants' first argument. He contended that the California program was inconsistent with the policy of the Sherman Act, but expressly disclaimed any argument that the State of California or its officials had violated federal law.[19] Later in his brief the Solicitor General drew an

---

[17] The Honorable Earl Warren, later Chief Justice of the United States.

[18] In the index to his supplemental brief, the California Attorney General outlined his discussion of the Sherman Act in these words:

"The Sherman Anti-Trust law and the California raisin program ........................................... 35

"1. Is a state subject to the Sherman Act?............... 35

"2. Does the state seasonal program for raisins violate the provisions of the Sherman Act?.................... 48

"(a) The Sherman Act is circumscribed by the rule of reason ................................... 53

"(b) Federal legislation as exempting state program from anti-trust laws............................... 60

"3. May the California raisin program be enjoined in the present action?................................. 64"

[19] At p. 59 of its brief, the Government stated:

"The Sherman Act does not in terms define its scope in so far as it applies to the activities of state governments. But nothing

important distinction between economic action taken by the State itself and private action taken pursuant to a state statute permitting or requiring individuals to engage in conduct prohibited by the Sherman Act. The Solicitor General contended that the private conduct would clearly be illegal but recognized that a different problem existed with respect to the State itself.[20] It was the latter problem that was presented in the *Parker* case.

This Court set aside the injunction entered by the District Court. In the portion of his opinion for the Court discussing the Sherman Act issue, Mr. Chief Justice Stone addressed only the first of the three arguments advanced by the California Attorney General. The Court held that even though comparable programs organized by private persons would be illegal, the action taken by state officials pursuant to express legislative command did not violate the Sherman Act.[21]

---

in the Act precludes its application to programs sponsored by the states. Sections 1 and 2 prohibit unlawful conduct by 'persons,' and the word 'person,' as defined in Section 7, in some connections at least, may include a state. *Georgia* v. *Evans*, 316 U. S. 159.

"But the question we face here is not whether California or its officials have violated the Sherman Act, but whether the state program interferes with the accomplishment of the objectives of the federal statute."

[20] At p. 63 of its brief, the Government stated:

"A state statute permitting, or requiring, dealers in a commodity to combine so as to limit the supply or raise the price of a subject of interstate commerce would clearly be void. The question here is whether a state may itself undertake to control the supply and price of a commodity shipped in interstate commerce or otherwise restrain interstate competition through a mandatory regulation."

[21] "But it is plain that the prorate program here was never intended to operate by force of individual agreement or combination. It derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become

This narrow holding made it unnecessary for the Court to agree or to disagree with the Solicitor General's view that a state statute permitting or requiring private conduct prohibited by federal law "would clearly be void." [22] The Court's narrow holding also avoided any question about the applicability of the antitrust laws to private action taken under color of state law.

Unquestionably the term "state action" may be used broadly to encompass individual action supported to some extent by state law or custom. Such a broad use of the term, which is familiar in civil rights litigation,[23] is not,

---

effective without that command. We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

"The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state.

.    .    .    .    .

"There is no suggestion of a purpose to restrain state action in the Act's legislative history. The sponsor of the bill which was ultimately enacted as the Sherman Act declared that it prevented only 'business combinations.' 21 Cong. Rec. 2562, 2457; see also [id.,] at 2459, 2461. That its purpose was to suppress combinations to restrain competition and attempts to monopolize by individuals and corporations, abundantly appears from its legislative history.

.    .    .    .    .

"The state in adopting and enforcing the prorate program made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly but, as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit. *Olsen* v. *Smith,* 195 U. S. 332, 344-[3]45; cf. *Lowenstein* v. *Evans,* 69 F. 908, 910." 317 U. S., at 350–352.

[22] See n. 15, *supra.*

[23] See *Monroe* v. *Pape,* 365 U. S. 167, 172–187; *Adickes* v. *Kress*

however, what Mr. Chief Justice Stone described in his *Parker* opinion. He carefully selected language which plainly limited the Court's holding to official action taken by state officials.[24]

In this case, unlike *Parker*, the only defendant is a private utility. No public officials or agencies are named as parties and there is no claim that any state action violated the antitrust laws. Conversely, in *Parker* there was no claim that any private citizen or company had violated the law. The only Sherman Act issue decided was whether the sovereign State itself, which had been held to be a person within the meaning of § 7 of the statute, was also subject to its prohibitions. Since the case now before us does not call into question the legality of any

---

& *Co.*, 398 U. S. 144, 188–234 (BRENNAN, J., concurring in part and dissenting in part).

[24] In his three-page discussion of the Sherman Act issue in *Parker* v. *Brown*, Mr. Chief Justice Stone made 13 references to the fact that state action was involved. Each time his language was carefully chosen to apply only to official action, as opposed to private action approved, supported, or even directed by the State. Thus, his references were to (1) "the legislative command of the state," and (2) "a state or its officers or agents from activities directed by its legislature," 317 U. S., at 350; and to (3) "a state's control over its officers and agents," (4) "the state as such," (5) "state action or official action directed by a state," and (6) "state action," *id.*, at 351; and to (7) "the state command to the Commission and to the program committee," (8) "state action," (9) "the state which has created the machinery for establishing the prorate program," (10) "it is the state, acting through the Commission, which adopts the program . . . ," (11) "[t]he state itself exercises its legislative authority," (12) "[t]he state in adopting and enforcing the prorate program . . . ," and finally (13) "as sovereign, imposed the restraint as an act of government . . . ," *id.*, at 352.

The cumulative effect of these carefully drafted references unequivocally differentiates between official action, on the one hand, and individual action (even when commanded by the State), on the other hand.

act of the State of Michigan or any of its officials or agents, it is not controlled by the *Parker* decision.

## III

In this case we are asked to hold that private conduct required by state law is exempt from the Sherman Act. Two quite different reasons might support such a rule. First, if a private citizen has done nothing more than obey the command of his state sovereign, it would be unjust to conclude that he has thereby offended federal law. Second, if the State is already regulating an area of the economy, it is arguable that Congress did not intend to superimpose the antitrust laws as an additional, and perhaps conflicting, regulatory mechanism. We consider these two reasons separately.

We may assume, *arguendo*, that it would be unacceptable ever to impose statutory liability on a party who had done nothing more than obey a state command. Such an assumption would not decide this case, if, indeed, it would decide any actual case. For typically cases of this kind involve a blend of private and public decisionmaking.[25] The Court has already decided that state authorization,[26] approval,[27] encouragement,[28] or

---

[25] Indeed, in *Parker* v. *Brown* itself, there was significant private participation in the formulation and effectuation of the proration program. As the Court pointed out, approval of the program upon referendum by a prescribed number of producers was one of the conditions for effectuating the program. See *ibid.*

[26] "It cannot be said that any State may give a corporation, created under its laws, authority to restrain interstate or international commerce against the will of the nation as lawfully expressed by Congress." *Northern Securities Co.* v. *United States,* 193 U. S. 197, 346.

[27] In the *Parker* opinion itself, the Court pointed out that a State does not give immunity to those who violate the Sherman Act "by declaring that their action is lawful." 317 U. S., at 351.

[28] "Respondents' arguments, at most, constitute the contention

participation [29] in restrictive private conduct confers no antitrust immunity. And in *Schwegmann Bros.* v. *Calvert Corp.,* 341 U. S. 384, the Court invalidated the plaintiff's entire resale price maintenance program even though it was effective throughout the State only because the Louisiana statute imposed a direct restraint on retailers who had not signed fair trade agreements.[30]

In each of these cases the initiation and enforcement of the program under attack involved a mixture of private and public decisionmaking. In each case, notwithstanding the state participation in the decision, the private party exercised sufficient freedom of choice to enable the Court to conclude that he should be held responsible for the consequences of his decision.

The case before us also discloses a program which is the product of a decision in which both the respondent and the

---

that their activities complemented the objective of the ethical codes. In our view that is not state action for Sherman Act purposes. It is not enough that, as the County Bar puts it, anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign," *Goldfarb* v. *Virginia State Bar,* 421 U. S. 773, 791.

[29] See *Continental Co.* v. *Union Carbide,* 370 U. S. 690; cf. also *Union Pacific R. Co.* v. *United States,* 313 U. S. 450, cited in *Parker* v. *Brown, supra,* at 352.

[30] Thus, although the private decision to enforce a statewide fair trade program was not only approved by the State, but actually would have been ineffective without the statutory command to nonsigners to adhere to the prices set by the plaintiff, the rationale of *Parker* v. *Brown* did not immunize the restraint. Quite the contrary, in his opinion for the Court Mr. Justice Douglas cited *Parker* for the proposition that private conduct was forbidden by the Sherman Act even though the State had compelled retailers to follow a parallel price policy. He said: "Therefore, when a state compels retailers to follow a parallel price policy, it demands private conduct which the Sherman Act forbids. See *Parker* v. *Brown,* 317 U. S. 341, 350." 341 U. S.. at 389.

Commission participated. Respondent could not maintain the lamp-exchange program without the approval of the Commission, and now may not abandon it without such approval. Nevertheless, there can be no doubt that the option to have, or not to have, such a program is primarily respondent's, not the Commission's.[31] Indeed, respondent initiated the program years before the regulatory agency was even created. There is nothing unjust in a conclusion that respondent's participation in the decision is sufficiently significant to require that its conduct implementing the decision, like comparable conduct by unregulated businesses, conform to applicable federal law.[32] Accordingly, even though there may be cases in which the State's participation in a decision is so dom-

---

[31] We recently described an analogous exercise of a public utility's power to make business decisions subject to Commission approval in *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345:

"The nature of governmental regulation of private utilities is such that a utility may frequently be required by the state regulatory scheme to obtain approval for practices a business regulated in less detail would be free to institute without any approval from a regulatory body. Approval by a state utility commission of such a request from a regulated utility, where the Commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the Commission into 'state action.' At most, the Commission's failure to overturn this practice amounted to no more than a determination that a Pennsylvania utility was authorized to employ such a practice if it so desired. Respondent's exercise of the choice allowed by state law where the initiative comes from it and not from the State, does not make its action in doing so 'state action' for purposes of the Fourteenth Amendment." *Id.*, at 357. (Footnote omitted.)

[32] Nor is such a conclusion even arguably inconsistent with the underlying rationale of *Parker* v. *Brown*. For in that case California required every raisin producer in the State to comply with the proration program, whereas Michigan has never required any utility to adopt a lamp-exchange program.

inant that it would be unfair to hold a private party responsible for his conduct in implementing it, this record discloses no such unfairness.

Apart from the question of fairness to the individual who must conform not only to state regulation but to the federal antitrust laws as well, we must consider whether Congress intended to superimpose antitrust standards on conduct already being regulated under a different standard. *Amici curiae* forcefully contend that the competitive standard imposed by antitrust legislation is fundamentally inconsistent with the "public interest" standard widely enforced by regulatory agencies, and that the essential teaching of *Parker* v. *Brown* is that the federal antitrust laws should not be applied in areas of the economy pervasively regulated by state agencies.

There are at least three reasons why this argument is unacceptable. First, merely because certain conduct may be subject both to state regulation and to the federal antitrust laws does not necessarily mean that it must satisfy inconsistent standards; second, even assuming inconsistency, we could not accept the view that the federal interest must inevitably be subordinated to the State's; and finally, even if we were to assume that Congress did not intend the antitrust laws to apply to areas of the economy primarily regulated by a State, that assumption would not foreclose the enforcement of the antitrust laws in an essentially unregulated area such as the market for electric light bulbs.

Unquestionably there are examples of economic regulation in which the very purpose of the government control is to avoid the consequences of unrestrained competition. Agricultural marketing programs, such as that involved in *Parker,* were of that character. But all economic regulation does not necessarily suppress competition. On the contrary, public utility regulation typically

assumes that the private firm is a natural monopoly and that public controls are necessary to protect the consumer from exploitation.[33] There is no logical inconsistency between requiring such a firm to meet regulatory criteria insofar as it is exercising its natural monopoly powers and also to comply with antitrust standards to the extent that it engages in business activity in competitive areas of the economy.[34] Thus, Michigan's regulation of respondent's distribution of electricity poses no necessary conflict with a federal requirement that respondent's activities in competitive markets satisfy antitrust standards.[35]

The mere possibility of conflict between state regulatory policy and federal antitrust policy is an insufficient basis for implying an exemption from the federal antitrust laws. Congress could hardly have intended state regulatory agencies to have broader power than federal agencies to exempt private conduct from the antitrust laws.[36] Therefore, assuming that there are situations in

---

[33] As MR. JUSTICE STEWART pointed out in his dissenting opinion in *Otter Tail Power Co.* v. *United States,* 410 U. S. 366, 389, the "very reason for the regulation of private utility rates—by state bodies and by the Commission—is the inevitability of a monopoly that requires price control to take the place of price competition."

[34] Commenting on a possible conflict between federal regulatory policy and federal antitrust policy we have repeatedly said " '[r]epeal [of the antitrust laws] is to be regarded as implied only if necessary to make the . . . [Act] work, and even then only to the minimum extent necessary.' " *Id.,* at 391, quoting *Silver* v. *New York Stock Exchange,* 373 U. S. 341, 357.

[35] Indeed, since our decision in *Otter Tail Power Co.* v. *United States, supra,* there can be no doubt about the proposition that the federal antitrust laws are applicable to electrical utilities. Although there was dissent from the particular application of the statute in that case, there was no dissent from the basic proposition that such utilities must obey the federal antitrust laws.

[36] Respondent does not argue that state regulation provides a

which the existence of state regulation should give rise to an implied exemption, the standards for ascertaining the existence and scope of such an exemption surely must be at least as severe as those applied to federal regulatory legislation.

The Court has consistently refused to find that regulation gave rise to an implied exemption without first determining that exemption was necessary in order to make the regulatory Act work, "and even then only to the minimum extent necessary." [37]

---

stronger justification for an implied exemption than federal regulation. On the contrary, respondent relies heavily on *Gordon* v. *New York Stock Exchange,* 422 U. S. 659, in which the Court upheld the fixed commissions of the stock exchange as an integral part of the effective operation of the Securities Exchange Act of 1934. The inapplicability of that case is manifest from MR. JUSTICE STEWART's brief concurring opinion in which he stated:

"The Court has never held, and does not hold today, that the antitrust laws are inapplicable to anticompetitive conduct simply because a federal agency has jurisdiction over the activities of one or more of the defendants. An implied repeal of the antitrust laws may be found only if there exists a 'plain repugnancy between the antitrust and regulatory provisions.' *United States* v. *Philadelphia Nat. Bank,* 374 U. S. 321, 351.

"The mere existence of the Commission's reserve power of oversight with respect to rules initially adopted by the exchanges, therefore, does not necessarily immunize those rules from antitrust attack. . . . The question presented by the present case, therefore, is whether exchange rules fixing minimum commission rates are 'necessary to make the Securities Exchange Act work.' " *Id.,* at 692–693.

The lamp-supply program is by no means comparably imperative in the continued effective functioning of Michigan's regulation of the utilities industry.

[37] See n. 34, *supra.* Recent cases make it clear that the relevant " 'aspect of the agency's jurisdiction must be sufficiently central to the purposes of the enabling statute so that implied repeal of the antitrust laws is 'necessary to make the [regulatory

The application of that standard to this case inexorably requires rejection of respondent's claim. For Michigan's regulatory scheme does not conflict with federal antitrust policy and, conversely, if the federal antitrust laws should be construed to outlaw respondent's light-bulb-exchange program, there is no reason to believe that Michigan's regulation of its electric utilities will no longer be able to function effectively. Regardless of the outcome of this case, Michigan's interest in regulating its utilities' distribution of electricity will be almost entirely unimpaired.

We conclude that neither Michigan's approval of the tariff filed by respondent, nor the fact that the lamp-exchange program may not be terminated until a new tariff is filed, is a sufficient basis for implying an exemption from the federal antitrust laws for that program.[38]

## IV

The dissenting opinion voices the legitimate concern that violation of the antitrust laws by regulated companies may give rise to "massive treble damage liabilities." This is an oft-repeated criticism of the inevitably

---

scheme] work.'" Robinson, Recent Antitrust Developments: 1975, 31 Record of N. Y. C. B. A. 38, 57–58 (1976).

In *United States* v. *National Assn. of Securities Dealers,* 422 U. S. 694, 719–720, the Court pointed out:

"Implied antitrust immunity is not favored, and can be justified only by a convincing showing of clear repugnancy between the antitrust laws and the regulatory system. See, *e. g., United States* v. *Philadelphia Nat. Bank,* 374 U. S., at 348; *United States* v. *Borden Co.,* 308 U. S. 188, 197–206 (1939)."

These cases are, of course, consistent with the "cardinal rule," applicable to legislation generally, that repeals by implication are not favored. *Posadas* v. *National City Bank,* 296 U. S. 497, 503.

[38] Of course, the absence of an exemption from the antitrust laws does not mean that those laws have been violated.

imprecise language of the Sherman Act and of the consequent difficulty in predicting with certainty its application to various specific fact situations.[39]  The far-reaching value of this basic part of our law, however, has enabled it to withstand such criticism in the past.[40]

The concern about treble-damage liability has arguable relevance to this case in two ways.  If the hazard of violating the antitrust laws were enhanced by the fact of regulation, or if a regulated company had engaged in anticompetitive conduct in reliance on a justified understanding that such conduct was immune from the antitrust laws, a concern with the punitive aspects of the treble-damage remedy would be appropriate.  But neither of those circumstances is present in this case.

When regulation merely takes the form of approval of a tariff proposed by the company, it surely has not increased the company's risk of violating the law.  The

---

[39] It is this concern which has repeatedly prompted the introduction of bills which, if adopted, would make the award of treble damages in antitrust litigation discretionary rather than mandatory. See Report of the Attorney General's National Committee to Study the Antitrust Laws 378–380 (1955).  See also, e. g., H. R. 978, 85th Cong., 1st Sess. (1957); H. R. 190, 87th Cong., 1st Sess. (1961).

[40] "As a charter of freedom, the Act has a generality and adaptability comparable to that found to be desirable in constitutional provisions.  It does not go into detailed definitions which might either work injury to legitimate enterprise or through particularization defeat its purposes by providing loopholes for escape.  The restrictions the Act imposes are not mechanical or artificial.  Its general phrases, interpreted to attain its fundamental objects, set up the essential standard of reasonableness.  They call for vigilance in the detection and frustration of all efforts unduly to restrain the free course of interstate commerce, but they do not seek to establish a mere delusive liberty either by making impossible the normal and fair expansion of that commerce or the adoption of reasonable measures to protect it from injurious and destructive practices and to promote competition upon a sound basis." *Appalachian Coals, Inc.* v. *United States,* 288 U. S. 344, 359–360.

respondent utility maintained its lamp-exchange program both before and after it was regulated. The approval of the program by the Michigan Commission provided the company with an arguable defense to the antitrust charge, but did not increase its exposure to liability.

Nor can the utility fairly claim that it was led to believe that its conduct was exempt from the federal antitrust laws. A claim of immunity or exemption is in the nature of an affirmative defense to conduct which is otherwise assumed to be unlawful. This Court has never sustained a claim that otherwise unlawful private conduct is exempt from the antitrust laws because it was permitted or required by state law.

In the Court's most recent consideration of this subject, it described the defendant's claim with pointed precision as "this so-called state-action exemption." *Goldfarb* v. *Virginia State Bar,* 421 U. S. 773, 788. The Court then explained that the question whether the anticompetitive activity had been required by the State acting as sovereign was the "threshold inquiry" in determining whether it was state action of the type the Sherman Act was not meant to proscribe.[41] Certainly that careful use of language could not have been read as a guarantee that compliance with any state requirement would automatically confer federal antitrust immunity.

The dissenting opinion in this case makes much of the obvious fact that *Parker* v. *Brown* implicitly held that California's raisin-marketing program was not a violation of the Sherman Act. That is, of course, perfectly

---

[41] "The threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe is whether the activity is required by the State acting as sovereign. *Parker* v. *Brown,* 317 U. S., at 350–352; *Continental Co.* v. *Union Carbide,* 370 U. S. 690, 706–707 (1962)." 421 U. S., at 790.

true. But the only way the legality of any program may be tested under the Sherman Act is by determining whether the persons who administer it have acted lawfully. The federal statute proscribes the conduct of persons, not programs, and the narrow holding in *Parker* concerned only the legality of the conduct of the state officials charged by law with the responsibility for administering California's program. What sort of charge might have been made against the various private persons who engaged in a variety of different activities implementing that program is unknown and unknowable because no such charges were made.[42] Even if the state program had been held unlawful, such a holding would not necessarily have supported a claim that private individuals who had merely conformed their conduct to an invalid program had thereby violated the Sherman Act. Unless and until a court answered that question, there would be no occasion to consider an affirmative defense of immunity or exemption.

Nor could respondent justifiably rely on either the holding in *Eastern R. Conf.* v. *Noerr Motors,* 365 U. S. 127, or the reference in that opinion to *Parker.*[43] The holding in *Noerr* was that the concerted activities of the railroad defendants in opposing legislation favorable to the plaintiff motor carriers was not prohibited by the Sherman Act. The case did not involve any question of either liability or exemption for private action taken in compliance with state law.

Moreover, nothing in the *Noerr* opinion implies that

---

[42] Indeed, it did not even occur to the plaintiff that the state officials might have violated the Sherman Act; that question was first raised by this Court.

[43] Actually the reference was primarily to *United States* v. *Rock Royal Co-op.,* 307 U. S. 533, and only secondarily to *Parker.* See 365 U. S., at 136 n. 15.

the mere fact that a state regulatory agency may approve a proposal included in a tariff, and thereby require that the proposal be implemented until a revised tariff is filed and approved, is a sufficient reason for conferring antitrust immunity on the proposed conduct. The passage quoted in the dissent, *post*, at 622, sets up an assumed dichotomy between a restraint imposed by governmental action, as contrasted with one imposed by private action, and then cites *United States* v. *Rock Royal Co-op.*, 307 U. S. 533, and *Parker* for the conclusion that the former does not violate the Sherman Act.[44] That passing reference to *Parker* sheds no light on the significance of state action which amounts to little more than approval of a private proposal. It surely does not qualify the categorical statement in *Parker* that "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." 317 U. S., at 351. Yet the dissent would allow every state agency to grant precisely that immunity by merely including a direction to engage in the proposed conduct in an approval order.[45]

---

[44] "We accept, as the starting point for our consideration of the case, the same basic construction of the Sherman Act adopted by the courts below—that no violation of the Act can be predicated upon mere attempts to influence the passage or enforcement of laws. It has been recognized, at least since the landmark decision of this Court in *Standard Oil Co.* v. *United States*, [221 U. S. 1,] that the Sherman Act forbids only those trade restraints and monopolizations that are created, or attempted, by the acts of 'individuals or combinations of individuals or corporations.' Accordingly, it has been held that where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the Act can be made out." (*Rock Royal* and *Parker* are then cited in the footnote which is omitted.) 365 U. S., at 135–136.

[45] MR. JUSTICE STEWART's analysis rests largely on the dubious assumption that if each of several steps in the implementation of an anticompetitive program is lawful, the entire program must be equally lawful.

Mr. Justice Stewart's separate opinion possesses a virtue which ours does not. It announces a simple rule that can easily be applied in any case in which a state regulatory agency approves a proposal and orders a regulated company to comply with it. No matter what the impact of the proposal on interstate commerce, and no matter how peripheral or casual the State's interests may be in permitting it to go into effect, the state act would confer immunity from treble-damages liability. Such a rule is supported by the wholesome interest in simplicity in the regulation of a complex economy. In our judgment, however, that interest is heavily outweighed by the fact that such a rule may give a host of state regulatory agencies broad power to grant exemptions from an important federal law for reasons wholly unrelated either to federal policy or even to any necessary significant state interest. Although it is tempting to try to fashion a rule which would govern the decision of the liability issue and the damages issue in all future cases presenting state-action issues, we believe the Court should adhere to its settled policy of giving concrete meaning to the general language of the Sherman Act by a process of case-by-case adjudication of specific controversies.

Since the District Court has not yet addressed the question whether the complaint alleged a violation of the antitrust laws, the case is remanded for a determination of that question and for such other proceedings as may be appropriate.

*Reversed and remanded.*

Mr. Chief Justice Burger, concurring in the judgment and in all except Parts II and IV of the Court's opinion.

I concur in the judgment and in all except Parts II and IV of the Court's opinion. I do not agree, however, that *Parker* v. *Brown,* 317 U. S. 341 (1943), can logically be

limited to suits against state officials. In interpreting *Parker,* the Court has heretofore focused on the challenged *activity,* not upon the identity of the *parties* to the suit.

> "The threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe is whether the *activity* is required by the State acting as sovereign." *Goldfarb* v. *Virginia State Bar,* 421 U. S. 773, 790 (1975) (emphasis added).

If *Parker*'s holding were limited simply to the nonliability of state officials, then the Court's inquiry in *Goldfarb* as to the County Bar Association's claimed exemption could have ended upon our recognition that the organization was "a voluntary association and not a state agency . . . ." 421 U. S., at 790. Yet, before determining that there was no exemption from the antitrust laws, the Court proceeded to treat the Association's contention that its action, having been "prompted" by the State Bar, was "state action for Sherman Act purposes." *Ibid.*

The reading of *Parker* in Part II is unnecessary to the result in this case; that decision simply does not address the precise issue raised by the present case. There was no need in *Parker* to focus upon the situation where the State, in addition to requiring a public utility "to meet regulatory criteria insofar as it is exercising its natural monopoly powers," *ante,* at 596, also purports, without any independent regulatory purpose, to control the utility's activities in separate, competitive markets. Today the Court correctly concludes:

> "The Commission's approval of respondent's decision to maintain such a program does not . . . implement any statewide policy relating to light bulbs. We infer that the State's policy is *neutral* on the ques-

tion whether a utility should, or should not, have such a program." *Ante*, at 585 (emphasis added).

To find a "state action" exemption on the basis of Michigan's undifferentiated sanction of this ancillary practice could serve no federal or state policy.

MR. JUSTICE BLACKMUN, concurring in the judgment.

I agree with the Court insofar as it holds that the fact that anticompetitive conduct is sanctioned, or even required, by state law does not of itself put that conduct beyond the reach of the Sherman Act. Since the opposite proposition is the ground on which the Court of Appeals affirmed the dismissal of this suit, I also agree that its judgment must be reversed. My approach, however, is somewhat different from that of the Court.

I

As to the principal question in the case, that of the Sherman Act's pre-emptive effect upon inconsistent state laws, it is, as the dissent points out, one of congressional intent. No one denies that Congress could, if it wished, override those state laws whose operation would subvert the federal policy of free competition in interstate commerce. In discerning that intent, however, I find somewhat less assistance in the legislative history than does the dissent. It is true that the framers of the Sherman Act expressed the view that certain areas of economic activity were left entirely to state regulation. The dissent quotes several of these expressions. *Post*, at 632–634. A careful reading of those statements reveals, however, that they little more than reflect the then-prevailing view that Congress lacked the *power*, under the Commerce Clause, to regulate economic activity that was within the domain of the States. The Court since then has recognized a greatly expanded Commerce Clause

power. Arguably, the Sherman Act should have remained confined within the outlines of that power as it was thought to exist in 1890, on the theory that if Congress believed it could not regulate any more broadly, it must not have attempted to do so. But that bridge already has been crossed, for it has been held that Congress intended the reach of the Sherman Act to expand along with that of the commerce power. *Hospital Building Co.* v. *Rex Hospital Trustees,* 425 U. S. 738, 743 n. 2 (1976), and cases cited.

Our question in this case is one that the Sherman Act's framers did not directly confront or explicitly address: What was to be the result if the expanding ambit of the Sherman Act should bring it into conflict with inconsistent state law? But it seems to me that this bridge also has been crossed. In *Schwegmann Bros.* v. *Calvert Distillers Corp.,* 341 U. S. 384 (1951), the issue was whether the Sherman Act permitted enforcement of a Louisiana statute requiring compliance by liquor retailers with resale price agreements to which they were not parties, but which had been entered into by other retailers with their wholesale suppliers. The Court held the Louisiana statute unenforceable; there is no plausible reading of that decision other than that the statute was pre-empted by the Sherman Act.[1] *Northern Securities Co.* v. *United States,* 193 U. S. 197 (1904), is to the same effect. The defenders of the railroad holding company attacked in that case argued that it was beyond the Sherman Act's reach because it was lawful under the cor-

---

[1] The Court expressly stated in *Schwegmann:* "The fact that a state authorizes the price fixing does not, of course, give immunity to the scheme, absent approval by Congress." And again: "[W]hen a state compels retailers to follow a parallel price policy, it demands private conduct which the Sherman Act forbids." 341 U. S., at 386, 389.

poration laws of New Jersey. The holding company was nonetheless held unlawful, and, to that extent, the law of New Jersey was forced to give way.[2] Indeed, I suppose that some degree of state-law pre-emption is implicit in the most fundamental operation of the Sherman Act. If a State had no antitrust policy of its own, anticompetitive combinations of all kinds would be sanctioned and enforced under that State's general contract and corporation law. Yet, there has never been any doubt that if such combinations offend the Sherman Act, they are illegal, and state laws to that extent are overridden.[3]

Congress itself has given support to the view that inconsistent state laws are pre-empted by the Sherman Act. Were it the case that state statutes held complete sway, Congress would not have found it necessary in 1937 to pass the Miller-Tydings Fair Trade Act, 50 Stat. 693, amending the Sherman Act, specifically exempting from the latter's operation certain price maintenance agreements sanctioned by state law. 15 U. S. C. § 1. There are other instances of Congress' acting to protect state-sanctioned anticompetitive schemes from the Sher-

---

[2] The argument that New Jersey law exempted Northern Securities Company from the Sherman Act was thoroughly canvassed in the plurality opinion. 193 U. S., at 344–351. It was rejected for the reason "that no State can endow any of its corporations, or any combination of its citizens, with authority to restrain interstate or international commerce, or to disobey the national will as manifested in legal enactments of Congress." Id., at 350.

[3] In passing, we may cast at least a sidelong glance at a related area of federal trade regulation—that of the patent laws. Although the federal statute is no more explicit on the point than is the Sherman Act, see 35 U. S. C. § 100 et seq., it clearly pre-empts state laws that purport either to expand on or to infringe the federal patent monopoly. See, e. g., Lear, Inc. v. Adkins, 395 U. S. 653 (1969); Sears, Roebuck & Co. v. Stiffel Co., 376 U. S. 225 (1964); Compco Corp. v. Day-Brite Lighting, 376 U. S. 234 (1964).

man Act. In response to *Schwegmann*, see H. R. Rep. No. 1437, 82d Cong., 2d Sess., 1–2, Congress in 1952 passed the McGuire bill, 66 Stat. 632, extending the Miller-Tydings exemption to state statutes that enforced resale price agreements against nonsigners. 15 U. S. C. §§ 45 (a)(2) to (5). A similar enactment is the McCarran-Ferguson Act of 1945, 59 Stat. 34, exempting from federal statutes "any law enacted by any State for the purpose of regulating the business of insurance," with provision that the Sherman Act, and other named federal statutes, should apply to that business after a specified date "to the extent that such business is not regulated by State law." 15 U. S. C. § 1012 (b).[4] These express grants of Sherman Act immunity seem significant to me. As the Court stated in *United States* v. *Borden Co.*, 308 U. S. 188, 201 (1939), construing the immunity granted to certain agreements by the Agricultural Mar-

---

[4] The McCarran-Ferguson Act was passed in reaction to the holding in *United States* v. *Underwriters Assn.*, 322 U. S. 533 (1944), that the business of insurance is "commerce" within the meaning of the Sherman Act. Congress' expressed concern was that the application of that Act would "greatly impair or nullify the regulation of insurance by the States," bringing to a halt their "experimentation and investigation" in the area. The Act was vigorously endorsed by Governors and insurance commissioners of "almost all of the States." The Justice Department, in opposing the McCarran-Ferguson Act, specifically argued that *Parker* v. *Brown*, 317 U. S. 341 (1943), made the legislation unnecessary because it immunized the insurance business insofar as it was regulated by the States. Congress was not so sure:

"*Parker* v. *Brown* dealt with a State commission authorized by State statute to enforce a program in conformity with, if not supplementary to, a Federal statute. Obviously, all State regulation concerning insurance does not and would not fall in such a category." S. Rep. No. 1112, 78th Cong., 2d Sess., 5 (1944).

See also S. Rep. No. 20, 79th Cong., 1st Sess., 1–3 (1945); H. R. Rep. No. 873, 78th Cong., 1st Sess., 7 (1943); H. R. Rep. No. 143, 79th Cong., 1st Sess., 4 (1945).

keting Agreement Act of 1937, "[i]f Congress had desired to grant any further immunity, Congress doubtless would have said so."

## II

I also agree with MR. JUSTICE STEVENS that the particular anticompetitive scheme attacked in this case must fall despite the imprimatur it claims to have received from the State of Michigan. To say, as I have, that the Sherman Act generally pre-empts inconsistent state laws is not to answer the much more difficult question as to which such laws are pre-empted and to what extent. I fear there are no easy solutions, though several suggest themselves.

It cannot be decisive, for example, simply that a state law goes so far as to require, rather than simply to authorize, the anticompetitive conduct in question. The Court accepted this as a prerequisite to antitrust immunity in *Goldfarb* v. *Virginia State Bar,* 421 U. S. 773, 790 (1975), but it cannot alone be sufficient. The whole issue in *Schwegmann* was whether the State *could* require obedience to a fixed resale price arrangement. Similarly, compliance with an anticompetitive contract, or adherence to an illegal corporate combination, might well be "required" by a State's general contract and corporation law.

Neither can it be decisive that a particular state-sanctioned scheme was initiated by the private actors rather than by the State. I see no difference in the degree of private initiation as between the marketing arrangement approved in *Parker* v. *Brown,* 317 U. S. 341 (1943) (and properly approved, I think, for reasons set forth below), and the resale price maintenance scheme disapproved in *Schwegmann.* In each case the particular scheme was initiated by the private actors at the invitation of a general statute, with which they may or may

not have had anything to do. The same was true in *Northern Securities,* and the same is true here. To be sure, there is a certain rough justice, as well as an appearance of simplicity, in a rule based upon who actually is responsible for the scheme in question, but I fear that both the justice and the simplicity would prove illusory in the rule's actual application. Every state enactment is initiated, in its way, by its beneficiaries. It would scarcely make sense to immunize only those powerful enough to speak entirely through their governmental representatives, or, for that matter, to stifle such speech with the threat that it will destroy antitrust immunity. Moreover, the process of enactment is likely to involve such a complex interplay between those regulating and those regulated that it will be impossible to identify the true "initiator."

A final, ostensibly simple, solution that I find wanting would be to insist only on some degree of affirmative articulation by the State of its conscientious intent to sanction the challenged scheme, and its reasons therefor. This also is a tempting solution, particularly in this case, where there is little to suggest (at least in recent years) that the Michigan Public Service Commission has even actively considered the light-bulb tie-in, much less articulated a justification for it. Yet such a solution would also lead to perverse results. A regulation whose justification was too plain to require explication would be vulnerable; a questionable one could be immunized if its proponents had the skill or influence to generate the proper legislative history. And, of course, deciding how much "affirmative articulation" of state policy is enough is not a simple matter.

I would apply, at least for now, a rule of reason, taking it as a general proposition that state-sanctioned anticompetitive activity must fall like any other if its potential harms outweigh its benefits. This does not mean

that state-sanctioned and private activity are to be treated alike. The former is different because the fact of state sanction figures powerfully in the calculus of harm and benefit. If, for example, the justification for the scheme lies in the protection of health or safety, the strength of that justification is forcefully attested to by the existence of a state enactment. I would assess the justifications of such enactments in the same way as is done in equal protection review, and where such justifications are at all substantial (as one would expect them to be in the case of most professional licensing or fee-setting schemes, for example, cf. *Olsen v. Smith*, 195 U. S. 332 (1904)), I would be reluctant to find the restraint unreasonable. A particularly strong justification exists for a state-sanctioned scheme if the State in effect has substituted itself for the forces of competition, and regulates private activity to the same ends sought to be achieved by the Sherman Act. Thus, an anticompetitive scheme which the State institutes on the plausible ground that it will improve the performance of the market in fostering efficient resource allocation and low prices can scarcely be assailed. One could not doubt the legality of Detroit Edison's electric power monopoly; the fear of such a monopoly is primarily its tendency to charge excessive prices, but its prices in this instance are controlled by the State.

No doubt such a rule of reason will crystallize, as it is applied, into various *per se* rules relating to certain kinds of state enactments, such as the regulation of the classic natural monopoly, the public utility. We should not shrink in our general approach, however, from what seems to me our constitutionally mandated task, one often set for us by conflicting federal and state laws, and that is the balancing of implicated federal and state interests with a view to assuring that when these are truly in conflict, the former prevail.

The dissent's fears on this score appear to me to be exaggerated. The balancing of harm and benefit is, in general, a process with which federal courts are well acquainted in the antitrust field. The special problem of assessing state interests to determine whether they are strong enough to prevail against supreme federal dictates is also a familiar one to the federal courts. Indeed, a state action that interferes with competition not only among its own citizens but also among the States is already subject under the Commerce Clause to much the same searching review of state justifications as is proposed here. See, e. g., *Dean Milk Co.* v. *Madison,* 340 U. S. 349, 354 (1951) (state restriction on sale of milk not locally processed held invalid because "reasonable and adequate alternatives [were] available" to protect health interests); *Southern Pacific Co.* v. *Arizona,* 325 U. S. 761, 770–784 (1945) (state restriction of train lengths held invalid under the Commerce Clause because "the state [safety] interest is outweighed by the interest of the nation in an adequate, economical and efficient railway transportation service").

### III

By these standards the present case does not seem a difficult one. The light-bulb tie-in presents the usual dangers of such a scheme, principally that respondent will extend its monopoly from the sale of electric power into that of light bulbs, not because it sells better light bulbs, but because its light bulbs are the ones customers must pay for if they are to have light at all. See P. Areeda, Antitrust Analysis 569–570 (2d ed. 1974). On the record before us the scheme appears to be unjustified. No doubt it originated as a means to promote electric power use, but it is difficult to see why a tie-in (rather than an optional, promotional light-bulb sale) was nec-

essary to that end even in the 19th century, laying aside the question whether the promotion of greater electric power use remains today a plausible public goal. Respondent would justify the scheme on the ground of consumer savings, its light bulbs assertedly being cheaper and better than those commercially available. Brief for Respondent 7–9, 41–42. But again, a tie-in is not necessary to pass along these savings. A tie-in is only necessary in order to force consumers to pay for light bulbs from Detroit Edison rather than someone else. But there is no indication that one light bulb does not fit the socket as well as another, or that the sale of light bulbs is in any way crucial to respondent's successful operation. Conceivably, Michigan's aim is the very extension of the monopoly, born of a preference for having light bulbs supplied by one whose prices are already regulated. But ending competition in the light-bulb market cannot be accepted as an adequate state objective without some evidence—of which there is not the least hint in this record—that such competition is in some way ineffective. For all that appears, light-bulb marketing, unlike electric power production, is not a natural monopoly, nor does it implicate health or safety, nor is it beset with problems of instability or other flaws in the competitive market.[5]

---

[5] The approach described in the text is entirely consistent with the result reached in *Parker* v. *Brown*. Wildly fluctuating agricultural prices are a prime candidate for some collective scheme that interrupts free competition in order to bring badly needed stability; under the State's close supervision, as was the case in *Parker*, the scheme seems entirely reasonable. I see no reason to disapprove the holding of *Parker*, therefore, and to the extent that the plurality, by stressing the identity of the state defendants in that case, intimates that a different result might have been reached had the raisin growers themselves been sued, I cannot agree.

Neither can I agree with the dissent, however, that *Parker* must be taken to stand for the broad proposition that a State can

This is what I take it the Court means when it says the electric light-bulb market is "essentially unregulated," and on that understanding I agree with its conclusion. It is conceivable that respondent may show, upon further evidence, a sufficient justification for the scheme, but it certainly has not done so as yet.[6]

MR. JUSTICE STEWART, with whom MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST join, dissenting.

The Court today holds that a public utility company, pervasively regulated by a state utility com-

---

immunize any conduct from the application of the Sherman Act. It is true, as the dissent points out, that there are statements arguably to that effect in *Parker*, but the opinion is hardly unambiguous on the point. The Court also observed in that case that "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." 317 U. S., at 351. Moreover, if we must choose between *Parker*'s more categorical statements and the seemingly contrary statements in *Schwegmann* and *Northern Securities*, see nn. 1 and 2, *supra*, I prefer the latter, as more in keeping with the actual holdings of those cases.

[6] MR. JUSTICE STEVENS states that there may be cases in which "the State's participation in a decision [to adopt the challenged restraint] is so dominant that it is unfair to hold a private party responsible for his conduct in implementing it." *Ante*, at 594–595. I agree that a defense based on fairness may be available. I would not, however, rule it out in this case, as the Court's opinion does. The parties, like the court below, so far have addressed themselves only to the question whether petitioner's suit is completely barred by *Parker* v. *Brown* and the Michigan Public Service Commission's approval of the challenged tie-in. I would confine our present decision to that question alone, leaving consideration of a fairness defense to the lower courts on remand, and making only these two further observations:

First, I take it that a defense based on fairness would be a defense to a damages recovery but not injunctive relief. The latter, of course, presents no danger of unfairness. Moreover, as MR. JUSTICE STEVENS implies by his emphasis on not unfairly holding a

mission, may be held liable for treble damages under the Sherman Act for engaging in conduct which, under the requirements of its tariff, it is obligated to perform. I respectfully dissent from this unprecedented application of the federal antitrust laws, which will surely result in disruption of the operation of every state-regulated public utility company in the Nation and in the creation of "the prospect of massive treble damage liabilities"[1] payable ultimately by the companies' customers.

The starting point in analyzing this case is *Parker* v. *Brown*, 317 U. S. 341. While *Parker* did not create the "so-called state-action exemption"[2] from the federal antitrust laws,[3] it is the case that is most frequently

---

private party "responsible," the defense rests on the theory, not that the challenged restraint is legal, but that since the defendant has committed no voluntary act in implementing it, he cannot be said to have violated any law. The same would not be true of acts following a judgment that the restraint is in fact illegal, and the state law to that extent invalid.

Second, I would hope that consideration will be given on remand to allowing a defense against damages wherever the conduct on which such damages would be based was required by state law. Such a rule would comport with the theory that a defendant should not be held "responsible" in damages for conduct as to which he had no choice, by which I do not mean to rule out other possible grounds for such a rule. See Posner, The Proper Relationship Between State Regulation and the Federal Antitrust Laws, 49 N. Y. U. L. Rev. 693, 728–732 (1974). It would also eliminate what seems to me the extremely unfair possibility that during a particular period—and it could be a regulatory lag during which the regulatee was attempting to *change* the state mandate—the regulatee could be required by state law to conform to a course of conduct for which he was all the while accumulating treble-damages liability under federal law.

[1] Posner, The Proper Relationship Between State Regulation and the Federal Antitrust Laws, 49 N. Y. U. L. Rev. 693, 728 (1974).

[2] *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773, 788.

[3] The progenitor of that doctrine in this Court was *Olsen* v. *Smith*, 195 U. S. 332, a decision relied on by *Parker* to support the

cited for the proposition that the "[Sherman] Act was intended to regulate private practices and not to prohibit a State from imposing a restraint as an act of government." *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773, 788. The plurality opinion would hold that that case decided only that "the sovereign State itself," *ante,* at 591, could not be sued under the Sherman Act. This view of *Parker*, which would trivialize that case to the point of overruling it,[4] flies in the face of the decisions of

proposition that when a State, acting as sovereign, imposes a restraint on commerce, that restraint does not violate the Sherman Act. *Parker* v. *Brown*, 317 U. S., at 352. *Olsen* involved a challenge to the validity of a Texas law fixing the charges of pilots operating in the port of Galveston and prohibiting all but duly commissioned pilots from engaging in the pilotage business. The Court rejected the argument that the Texas pilotage statutes were "repugnant . . . to the laws of Congress forbidding combinations in restraint of trade or commerce," 195 U. S., at 339:

"The contention that because the commissioned pilots have a monopoly of the business, and by combination among themselves exclude all others from rendering pilotage services, is also but a denial of the authority of the State to regulate, since if the State has the power to regulate, and in so doing to appoint and commission, those who are to perform pilotage services, it must follow that no monopoly or combination in a legal sense can arise from the fact that the duly authorized agents of the State are alone allowed to perform the duties devolving upon them by law. When the propositions just referred to are considered in their ultimate aspect they amount simply to the contention, not that the Texas laws are void for want of power, but that they are unwise. If an analysis of those laws justified such conclusion—which we do not at all imply is the case— the remedy is in Congress, in whom the ultimate authority on the subject is vested, and cannot be judicially afforded by denying the power of the State to exercise its authority over a subject concerning which it has plenary power until Congress has seen fit to act in the premises." *Id.*, at 344–345.

[4] If *Parker* v. *Brown, supra,* could be circumvented by the simple expedient of suing the private party against whom the State's "anticompetitive" command runs, then that holding would become an

this Court that have interpreted or applied *Parker*'s "state action" doctrine, and is unsupported by the sources on which the plurality relies.

As to those sources, I would have thought that except in rare instances an analysis of the positions taken by the parties in briefs submitted to this Court should play no role in interpreting its written opinions.[5]   A

---

empty formalism, standing for little more than the proposition that Porter Brown sued the wrong parties.

MR. JUSTICE BLACKMUN in a separate opinion today states that he sees "no reason to disapprove the holding of *Parker*" *ante,* at 613 n. 5, but then proceeds to do precisely that.   The holding in *Parker* was that "[t]he state in adopting and enforcing the prorate program . . . imposed [a] restraint as an act of government which the Sherman Act did not undertake to prohibit." 317 U. S., at 352. MR. JUSTICE BLACKMUN's position is that the Sherman Act *does* prohibit all state-imposed restraints which do not satisfy the Sherman Act's "rule of reason"—a view quite different from the holding in *Parker.*   The fact that the *result* in *Parker* could have been reached by a different route—by a holding, for instance, that the prorate restraint was "reasonable" within the meaning of the Sherman Act or was impliedly exempted by the Agricultural Marketing Agreement Act of 1937—is simply irrelevant.

I am puzzled by MR. JUSTICE BLACKMUN's willingness to emasculate *Parker,* which the Court indicated to have continued vitality just this Term.   See *Virginia Pharmacy Bd.* v. *Virginia Consumer Council,* 425 U. S. 748, 770.   It seems to me that such a step is inconsistent not only with the legislative history of the Sherman Act but also with well-settled principles of *stare decisis* applicable to this Court's construction of federal statutes.   See *Edelman* v. *Jordan,* 415 U. S. 651, 671 n. 14.   If those principles preclude the reconsideration of an antitrust exemption which is in every sense an "aberration" and an "anomaly," *Flood* v. *Kuhn,* 407 U. S. 258, 282, then *a fortiori* they preclude the re-examination of an exemption that coincides with a clear expression of congressional intent.

[5] A different approach is, of course, called for in interpreting this Court's summary dispositions of appeals.   See generally *Hicks* v. *Miranda,* 422 U. S. 332, 345 n. 14; *Port Authority Bondholders*

contrary rule would permit the "plain meaning" of our decisions to be qualified or even overridden by their "legislative history"—*i. e.*, briefs submitted by the contending parties. The legislative history of congressional enactments is useful in discerning legislative intent, because that history emanates from the same source as the legislation itself and is thus directly probative of the intent of the draftsmen. The conflicting views presented in the adversary briefs and arguments submitted to this Court do not bear an analogous relationship to the Court's final product.

But assuming, *arguendo*, that it is appropriate to look behind the language of *Parker* v. *Brown, supra,* I think it is apparent that the plurality has distorted the positions taken by the State of California and the United States as *amici curiae*. The question presented on reargument in *Parker* was "whether the state statute involved is rendered invalid by the action of Congress in passing the Sherman Act . . . ." *Ante,* at 587 n. 16. This phrasing indicates that the precise issue on which the Court sought reargument was whether the California statute was pre-empted by the Sherman Act, not whether sovereign States were immune from suit under the Sherman Act.

The State of California and the Solicitor General certainly understood this to be the principal issue. As the plurality opinion correctly notes, the supplemental brief filed by the State of California in response to the question posed by this Court advanced three basic arguments. And as it further notes, this Court's decision in *Parker* rested on the first of those arguments. But what the plurality fails to acknowledge is that California's first argument was in principal part a straightforward conten-

---

*Protective Comm.* v. *Port of New York Authority,* 387 F. 2d 259, 262 (CA2).

tion that the Sherman Act was not intended to pre-empt state regulation of intrastate commerce.[6]

With respect to the *amicus* brief of the United States,

---

[6] California's argument began with a statement of the principle that the Federal Government and the States—"sister sovereignties," Supplemental Brief for Appellants 35 in *Parker* v. *Brown*, O. T. 1942, No. 46—are each "supreme" when legislating "within their respective spheres." "The subject of Federal power is still 'commerce,'—not all commerce, but commerce with foreign nations and among the several states." *Id.*, at 35–37. Incorporating by explicit reference its preceding argument with respect to whether the Federal Agricultural Adjustment Act of 1938 pre-empted the California statute, *id.*, at 38, and proceeding from the premise that the subject matter of the California law was intrastate commerce within the jurisdiction of the State, California contended that "it should never be held that Congress intends to supersede or suspend the exercise of the police powers of the States unless its purpose to effect that result is clearly manifested." *Ibid.* California added that "[s]uch an intent should be even more clear and express when it serves not only to suspend the police powers, but to subject the sovereignty of the State to the inhibition and penalties of Congressional action." *Id.*, at 38–39.

The plurality's position today seems to be that because the State of California placed particular emphasis on the fact that the proscriptions of the Sherman Act, if applicable, would run directly against the State, California's argument in the first part of its brief was simply and solely that "Congress never intended to subject a sovereign State to the provisions of the Sherman Act . . . ." *Ante,* at 588. Yet, as the preceding quotations show, California's argument in the first part of its brief dovetailed two interrelated themes: First, that state regulation of intrastate commerce was not pre-empted by the Sherman Act and, second, that the framers of the Sherman Act did not intend its proscriptions to run directly against the sovereign States. It was the first of these themes that California deemed primary. Near the close of the first part of California's brief appeared the following passage:

"To hold the State within the prohibition of the Sherman Act in the present instance would result in prohibiting it from exercising its otherwise valid police powers. This Court has repeatedly and emphatically stated that 'it should never be held that Congress

the plurality opinion states that the "Solicitor General did not take issue with the appellants' first argument." *Ante,* at 588. Indeed, the plurality says, the Solicitor General "expressly disclaimed any argument that the State of California or its officials had violated federal law." *Ibid.* In support of this assertion, the plurality opinion quotes the following language from p. 59 of the Solicitor General's brief in *Parker:*

> " '[T]he question we face here is not whether California or its officials have violated the Sherman Act, but whether the state program interferes with the accomplishment of the objectives of the federal statute.' " *Ante,* at 589 n. 19.

This statement by the Solicitor General was indeed correct, because the question on which the Court had requested supplemental briefing was "whether the state statute involved is rendered invalid by the action of Congress in passing the Sherman Act," not "whether California or its officials have violated the Sherman Act. . . ." As the Solicitor General noted in the very next sentence, "[a] state law may be superseded as conflicting with a federal statute irrespective of whether its administrators are subject to prosecution for violation of the paramount federal enactment."[7] The Solicitor General then pro-

---

intends to supersede or by its legislation suspend the exercise of the police powers of the State, even when it may do so, unless its purpose to effect that result is clearly manifested.' " Supplemental Brief for Appellants 47–48 in *Parker* v. *Brown,* O. T. 1942, No. 46 (footnote omitted).

[7] This distinction was properly drawn, as is apparent from decisions in the labor law context. A State or political subdivision thereof is not normally subject to the prohibitions of the National Labor Relations Act, 49 Stat. 449, as amended, 29 U. S. C. § 151 *et seq.* See, *e. g., NLRB* v. *Natural Gas Utility Dist.,* 402 U. S. 600. But it certainly does not follow that sovereign enactments of the State may not be deemed pre-empted by the federal legislation. *San*

ceeded to take strenuous issue with the principal con-
tention advanced in the first part of the relevant section
of California's brief—that the framers of the federal
legislation had not intended to pre-empt state legislation
like the California Agricultural Prorate Act.[8]

Thus, it is clear that the plurality has misread the posi-
tions taken by the State of California and the Solicitor
General in *Parker* v. *Brown*. The question presented
to the Court in *Parker* was whether the restraint on
trade effected by the California statute was exempt

---

*Diego Unions* v. *Garmon*, 359 U. S. 236; *Garner* v. *Teamsters*, 346
U. S. 485.

[8] The Solicitor General began his analysis with the following
statement:

"A state statute permitting, or requiring, dealers in a commodity to
combine so as to limit the supply or raise the price of a subject of
interstate commerce would clearly be void. The question here is
whether a state may itself undertake to control the supply and price
of a commodity shipped in interstate commerce or otherwise restrain
interstate competition through a mandatory regulation." Brief for
United States as *Amicus Curiae* 63 in *Parker* v. *Brown*, O. T. 1942,
No. 46.

He then acknowledged that "[i]t seems clear that Congress, when it
enacted the statute, did not intend to deprive the states of their
normal 'police' powers over business and industry. . . . For ex-
ample, in the field of public utilities, a state can undoubtedly regu-
late rates without running afoul of the Sherman Act notwithstanding
the fact that the rate regulation may embrace interstate commerce."
*Id.*, at 63–64 (footnotes and citations omitted). But, the Solicitor
General continued, "[a]lthough Congress plainly did not regard local
laws in these fields as incompatible with the Sherman Act, we
believe that the same cannot be said when the state statute is
*designed* directly to control the competitive aspects of an industry
in a manner which will have more than local effect." *Id.*, at 64–65.
This was the critical portion of the Solicitor General's argument,
which sought to draw a delicate distinction between acceptable police
power legislation, such as public utility regulation, and pre-empted
police power legislation, such as that designed explicitly to suppress
competition affecting interstate commerce.

from the operation of the Sherman Act. That was the question addressed by the Solicitor General and, in principal part, by the State of California. And it was the question resolved by this Court in its holding that "[t]he state in adopting and enforcing the prorate program made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly but, as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit." 317 U. S., at 352.

The notion that *Parker* decided only that "action taken by state officials pursuant to express legislative command did not violate the Sherman Act," *ante*, at 589, and that that "narrow holding . . . avoided any question about the applicability of the antitrust laws to private action" taken under command of state law, *ante*, at 590, is thus refuted by the very sources on which the plurality opinion relies. That narrow view of the *Parker* decision is also refuted by the subsequent cases in this Court that have interpreted and applied the *Parker* doctrine.

In *Eastern R. Conf.* v. *Noerr Motors,* 365 U. S. 127, for instance, the Court held that no violation of the Sherman Act could be predicated on the attempt by private persons to influence the passage or enforcement of state laws regulating competition in the trucking industry.[9] The Court took as its starting point the ruling in *Parker* v. *Brown* that "where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the Act can be made out." 365 U. S., at 136. The Court

---

[9] The only exception is where the attempt to influence state regulation is a "sham" aimed at "harass[ing] and deter[ring] . . . competitors from having 'free and unlimited access' to the agencies and courts . . . ." *California Motor Transport Co.* v. *Trucking Unlimited,* 404 U. S. 508, 515.

viewed it as "equally clear that the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or monopoly." *Ibid.* A contrary ruling, the Court held, "would substantially impair the power of government to take actions through its legislature and executive that operate to restrain trade." *Id.,* at 137. Surely, if a rule permitting Sherman Act liability to arise from lobbying by private parties for state rules restricting competition would impair the power of state governments to impose restraints, then *a fortiori* a rule permitting Sherman Act liability to arise from private parties' compliance with such rules would impair the exercise of the States' power. But as the Court in *Noerr* correctly noted, the latter result was foreclosed by *Parker's* holding that "where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the Act can be made out." 365 U. S., at 136.

Litigation testing the limits of the state-action exemption has focused on whether alleged anticompetitive conduct by private parties is indeed "the result of" state action. Thus, in *Goldfarb* v. *Virginia State Bar,* 421 U. S. 773, the question was whether price fixing practiced by the respondents was "required by the State acting as sovereign. *Parker* v. *Brown,* 317 U. S., at 350–352 . . . ." *Id.,* at 790. The Court held that the "so-called state-action exemption," *id.,* at 788, did not protect the respondents because it "cannot fairly be said that the State of Virginia through its Supreme Court Rules required the anticompetitive activities of either respondent. . . . Respondents' arguments, at most, constitute the contention that their activities complemented the ob-

jective of the ethical codes. In our view that is not state action for Sherman Act purposes. It is not enough that, as the County Bar puts it, anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign." *Id.*, at 790–791. The plurality's view that *Parker* does not cover state-compelled private conduct flies in the face of this carefully drafted language in the *Goldfarb* opinion.

*Parker, Noerr,* and *Goldfarb* point unerringly to the proper disposition of this case. The regulatory process at issue has three principal stages. First, the utility company proposes a tariff. Second, the Michigan Public Service Commission investigates the proposed tariff and either approves it or rejects it. Third, if the tariff is approved, the utility company must, under command of state law, provide service in accord with its requirements until or unless the Commission approves a modification. The utility company thus engages in two distinct activities: It proposes a tariff and, if the tariff is approved, it obeys its terms. The first action cannot give rise to antitrust liability under *Noerr* and the second—compliance with the terms of the tariff under the command of state law—is immune from antitrust liability under *Parker* and *Goldfarb*.[10]

---

[10] The Court's reliance on *Jackson* v. *Metropolitan Edison Co.,* 419 U. S. 345, is misplaced. There the Court held that a utility's discontinuance of service to a customer for nonpayment of bills was not "state action" sufficient to trigger the protections of the Due Process Clause of the Fourteenth Amendment. The petitioner had argued that because the State Public Utility Commission had approved that practice as a part of the respondent's general tariff, the termination was "state action" for Fourteenth Amendment purposes. *Id.*, at 354. The Court disagreed, holding as follows: "The nature of governmental regulation of private utilities is such that a utility may frequently be required by the state regulatory

The plurality's contrary view would effectively overrule not only *Parker* but the entire body of post-*Parker* case law in this area, including *Noerr*. With the *Parker* holding reduced to the trivial proposition that the Sherman Act was not intended to run directly against state officials or governmental entities, the Court would fashion a new two-part test for determining whether state utility regulation creates immunity from the federal antitrust law. The first part of the test would focus on whether subjecting state-regulated utilities to antitrust liability would be "unjust." The second part of the test would look to whether the draftsmen of the Sherman Act intended to "superimpose" antitrust standards, and thus exposure to treble damages, on conduct compelled by state regulatory laws. THE CHIEF JUSTICE accedes to the new two-part test, at least where the State "purports, without any independent regulatory purpose, to control [a] utility's activities in separate, competitive

---

scheme to obtain approval for practices a business regulated in less detail would be free to institute without any approval from a regulatory body. Approval by a state utility commission of such a request from a regulated utility, where the Commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the Commission into 'state action.' At most, the Commission's failure to overturn this practice amounted to no more than a determination that a Pennsylvania utility was authorized to employ such a practice if it so desired. Respondent's exercise of the choice allowed by state law where the initiative comes from it and not from the State, does not make its action in doing so 'state action' for purposes of the Fourteenth Amendment." *Id.*, at 357 (footnote omitted).

This constitutional holding has no bearing on whether a utility's action in compliance with a tariff which it proposed is exempt from Sherman Act liability. The latter is a question of legislative intent, not constitutional law, and must be answered on the basis of a separate line of authority—namely, decisions such as *Parker* and *Noerr* which have construed the Sherman Act.

markets." *Ante,* at 604. The new immunity test thus has the approval of a majority of the Court in instances where state-compelled anticompetitive practices are deemed "ancillary" to the State's regulatory goals.[11]

With scarcely a backward glance at the *Noerr* case, the Court concludes that because the utility company's "participation" in the decision to incorporate the lamp-exchange program into the tariff was "sufficiently significant," there is nothing "unjust" in concluding that the company is required to conform its conduct to federal antitrust law "like comparable conduct by unregulated businesses . . . ." *Ante,* at 594. This attempt to distinguish between the exemptive force of mandatory state rules adopted at the behest of private parties and those adopted pursuant to the State's unilateral decision is flatly inconsistent with the rationale of *Noerr.* There the Court pointedly rejected "[a] construction of the Sherman Act that would disqualify people from taking a public position on matters in which they are financially interested" because such a construction "would . . . deprive the government of a valuable source of information and, at the same time, deprive the people of their right to petition in the very instances in which that right may be of the most importance to them." 365 U. S., at 139.[12]

---

[11] I disagree with THE CHIEF JUSTICE's conclusion that Michigan's policy is "neutral" with respect to whether a utility should have a lamp-exchange program. See n. 26, *infra.* Moreover, I think it is apparent that insistence on statutory articulation of a state "purpose" to regulate activities performed incident to the provision of a "natural monopoly" service will lead to serious interference with state regulation. See *ibid.*

[12] As the Court noted in *Noerr,* the scheme at issue in *Parker* required popular initiative. 365 U. S., at 137–138, n. 17. And as it further noted, *Parker* itself expressly rejected the argument that the necessity for private initiative affected the "program's validity under the Sherman Act . . . ." *Id.,* at 137.

Today's holding will not only penalize the right to petition but may very well strike a crippling blow at state utility regulation. As the Court seems to acknowledge, such regulation is heavily dependent on the active participation of the regulated parties, who typically propose tariffs which are either adopted, rejected, or modified by utility commissions. But if a utility can escape the unpredictable consequences of the second arm of the Court's new test, see *infra,* this page, only by playing possum— by exercising no "option" in the Court's terminology, *ante,* at 594—then it will surely be tempted to do just that, posing a serious threat to efficient and effective regulation.

The second arm of the Court's new immunity test, which apparently comes into play only if the utility's own activity does not exceed a vaguely defined threshold of "sufficient freedom of choice," purports to be aimed at answering the basic question of whether "Congress intended to superimpose antitrust standards on conduct already being regulated" by state utility regulation laws. *Ante,* at 595. Yet analysis of the Court's opinion reveals that the three factors to which the Court pays heed have little or nothing to do with discerning congressional intent. Rather, the second arm of the new test simply creates a vehicle for ad hoc judicial determinations of the substantive validity of state regulatory goals, which closely resembles the discarded doctrine of substantive due process. See *Ferguson* v. *Skrupa,* 372 U. S. 726.

The Court's delineation of the second arm of the new test proceeds as follows. Apart from the "fairness" question, the Court states, there are "at least three reasons" why the light-bulb program should not enjoy Sherman Act immunity. *Ante,* at 595. "First," the Court observes, "merely because certain conduct may be subject both to state regulation and to the federal antitrust laws does not necessarily mean that it must satisfy

inconsistent standards . . . ." *Ibid.* That is true enough as an abstract proposition, but the very question is whether the utility's alleged "tie" of light-bulb sales to the provision of electric service is immune from antitrust liability, assuming it would constitute an antitrust violation in the absence of regulation.[13] Second, the Court states, "even assuming inconsistency, we could not accept the view that the federal interest must inevitably be subordinated to the State's . . . ." *Ibid.* The Court goes on to amplify this rationale as follows:

> "The mere possibility of conflict between state regulatory policy and federal antitrust policy is an insufficient basis for implying an exemption from the federal antitrust laws. Congress could hardly have intended state regulatory agencies to have broader power than federal agencies to exempt private conduct from the antitrust laws. Therefore,

---

[13] The Court seems to indicate at one point that it would be improper to "superimpose" antitrust liability on state regulatory schemes aimed at *suppressing* competition and *raising* prices. See *ante,* at 595 ("Unquestionably there are examples of economic regulation in which the very purpose of the government control is to avoid the consequences of unrestrained competition. Agricultural marketing programs, such as that involved in *Parker,* were of that character"). But some state regulation, the Court continues, aims not at suppressing competition, but rather at duplicating the effects of competition—*i. e.,* keeping prices down. With respect to state regulation of the latter type, the state scheme will not afford an exemption to the extent the regulated party is engaged in "business activity in competitive areas of the economy." *Ante,* at 596 (footnote omitted).

This rationale will not bear its own weight. If compliance with a state program aimed at *suppressing* competition in nonmonopoly industries—*i. e.,* raisin production—cannot give rise to Sherman Act liability, then surely compliance with a state program aimed at controlling the terms and conditions of service performed incident to the provision of a "natural monopoly" product cannot give rise to treble damages.

assuming that there are situations in which the existence of state regulation should give rise to an implied exemption, the standards for ascertaining the existence and scope of such an exemption surely must be at least as severe as those applied to federal regulatory legislation.

"The Court has consistently refused to find that regulation gave rise to an implied exemption without first determining that exemption was necessary in order to make the regulatory act work, 'and even then only to the minimum extent necessary.'

"The application of that standard to this case inexorably requires rejection of respondent's claim." *Ante,* at 596–598 (footnotes omitted).

The Court's analysis rests on a mistaken premise. The "implied immunity" doctrine employed by this Court to reconcile the federal antitrust laws and federal regulatory statutes cannot, rationally, be put to the use for which the Court would employ it. That doctrine, a species of the basic rule that repeals by implication are disfavored, comes into play only when two arguably inconsistent *federal* statutes are involved. " 'Implied repeal' " of federal antitrust laws by inconsistent state regulatory statutes is not only " 'not favored,' " *ante,* at 597–598, n. 37, it is impossible. See U. S. Const., Art. VI, cl. 2.

A closer scrutiny of the Court's holding reveals that its reference to the inapposite "implied repeal" doctrine is simply window dressing for a type of judicial review radically different from that engaged in by this Court in *Gordon* v. *New York Stock Exchange,* 422 U. S. 659, and *United States* v. *Philadelphia National Bank,* 374 U. S. 321. Those cases turned exclusively on issues of statutory construction and involved no judicial scrutiny of the abstract "necessity" or "centrality" of par-

ticular regulatory provisions. Instead, the federal regulatory statute was accepted as a given, as was the federal antitrust law. The Court's interpretative effort was aimed at accommodating these arguably inconsistent bodies of law, not at second-guessing legislative judgments concerning the "necessity" for including particular provisions in the regulatory statute.

The Court's approach here is qualitatively different. The State of Michigan, through its Public Service Commission, has decided that requiring Detroit Edison to provide "free" light bulbs as a term and condition of service is in the public interest. Yet the Court is prepared to set aside that policy determination: "The lamp-supply program is by no means . . . *imperative* in the continued effective functioning of Michigan's regulation of the utilities industry." *Ante,* at 597 n. 36 (emphasis added). Even "if the federal antitrust laws should be construed to outlaw respondent's light-bulb-exchange program, there is no reason to believe that Michigan's regulation of its electric utilities will no longer be able to *function effectively.* Regardless of the outcome of this case, Michigan's interest in regulating its utilities' distribution of electricity will be *almost entirely unimpaired." Ante,* at 598 (emphasis added).

The emphasized language in these passages shows that the Court is adopting an interpretation of the Sherman Act which will allow the federal judiciary to substitute its judgment for that of state legislatures and administrative agencies with respect to whether particular anticompetitive regulatory provisions are " 'sufficiently central,' " *ante,* at 597 n. 37, to a judicial conception of the proper scope of state utility regulation. The content of those " 'purposes,' " *ibid.,* which the Court will suffer the States to promote derives presumably from the mandate of the Sherman Act. On this assumption—and no other is plausible—it becomes appar-

ent that the Court's second reason for extending the Sherman Act to cover the light-bulb program, when divested of inapposite references to the federal implied repeal doctrine, is merely a restatement of the third rationale, which the Court phrases as follows: "[F]inally, even if we were to assume that Congress did not intend the antitrust laws to apply to areas of the economy primarily regulated by a State, that assumption would not foreclose the enforcement of the antitrust laws in an essentially unregulated area such as the market for electric light bulbs." *Ante*, at 595. This statement raises at last the only legitimate question, which is whether *Parker* erred in holding that Congress, in enacting the Sherman Act, did not intend to vitiate state regulation of the sort at issue here by creating treble-damages exposure for activities performed in compliance therewith.

The Court's rationale appears to be that the draftsmen of the Sherman Act intended to exempt state-regulated utilities from treble damages only to the extent those utilities are complying with state rules which narrowly reflect the "typica[l] assum[ption] that the [utility] is a natural monopoly" and which regulate the utility's "natural monopoly powers" as opposed to its "business activity in competitive areas of the economy." *Ante,* at 595–596 (footnotes omitted). Furthermore, such regulation must be " 'sufficiently central' " to the regulation of natural monopoly powers if it is to shield the regulated party from antitrust liability. *Ante,* at 597 n. 37. This Delphic reading of the Sherman Act, which is unaided by any reference to the language or legislative history of that Act, is, of course, inconsistent with *Parker* v. *Brown.* *Parker* involved a state scheme aimed at artificially raising the market price of raisins. Raisin production is not a "natural monopoly." If the limits of

the state-action exemption from the Sherman Act are congruent with the boundaries of "natural monopoly" power, then *Parker* was wrongly decided.

But the legislative history of the Sherman Act shows conclusively that *Parker* was correctly decided. The floor debates and the House Report on the proposed legislation clearly reveal, as at least one commentator has noted, that "Congress fully understood the narrow scope given to the commerce clause" in 1890.[14] This understanding is, in many ways, of historic interest only, because subsequent decisions of this Court have "permitted the reach of the Sherman Act to expand along with expanding notions of congressional power."[15] But the narrow view taken by the Members of Congress in 1890 remains relevant for the limited purpose of assessing their intention regarding the interaction of the Sherman Act and state economic regulation.

The legislative history reveals very clearly that Congress' perception of the limitations of its power under the Commerce Clause was coupled with an intent not to intrude upon the authority of the several States to regulate "domestic" commerce. As the House Report stated:

> "It will be observed that the provisions of the bill are carefully confined to such subjects of legislation as are clearly within the legislative authority of Congress.
>
> *"No attempt is made to invade the legislative au-*

---

[14] Slater, Antitrust and Government Action: A Formula for Narrowing Parker v. Brown, 69 Nw. U. L. Rev. 71, 84 (1974). See, e. g., 20 Cong. Rec. 1169 (1889) (remarks of Sen. Reagan); *id.,* at 1458 (remarks of Sen. George); 21 Cong. Rec. 2467 (1890) (remarks of Sen. Hiscock); *id.,* at 2469–2470 (remarks of Sen. Reagan); *id.,* at 2566 (remarks of Sen. Stewart); *id.,* at 2567 (remarks of Sen. Hoar); *id.,* at 2600 (remarks of Sen. George).

[15] *Hospital Building Co.* v. *Rex Hospital Trustees,* 425 U. S. 738, 743 n. 2.

*thority of the several States or even to occupy doubtful grounds.* No system of laws can be devised by Congress alone which would effectually protect the people of the United States against the evils and oppression of trusts and monopolies. Congress has no authority to deal, generally, with the subject within the States, and the States have no authority to legislate in respect of commerce between the several States or with foreign nations.

"It follows, therefore, that the legislative authority of Congress and that of the several States must be exerted to secure the suppression of restraints upon trade and monopolies. Whatever legislation Congress may enact on this subject, within the limits of its authority, will prove of little value unless the States shall supplement it by such auxiliary and proper legislation as may be within their legislative authority." [16]

Similarly, the floor debates on the proposed legislation reveal an intent to "g[o] as far as the Constitution permits Congress to go," [17] in the words of Senator Sherman, conjoined with an intent not to "interfere with" state-law efforts to "prevent *and control* combinations within the limit of the State." [18] Far from demonstrating an intent to pre-empt state laws aimed at preventing or controlling combinations or monopolies, the legislative debates show that Congress' goal was to supplement such state efforts, themselves restricted to the geographic boundaries of the several States. As Senator Sherman stated: "Each State can deal with a combination within the State, but only the General Government can deal

---

[16] H. R. Rep. No. 1707, 51st Cong., 1st Sess., 1 (1890) (emphasis added).

[17] 20 Cong. Rec. 1167 (1889).

[18] 21 Cong. Rec. 2456 (1890) (emphasis added).

with combinations reaching not only the several States, but the commercial world. This bill does not include combinations within a State . . . ."[19] Indeed a pre-existing body of state law forbidding combinations in restraint of trade provided the model for the federal Act. As Senator Sherman stated with respect to the proposed legislation: "It declares that certain contracts are against public policy, null and void. It does not announce a new principle of law, but applies old and well-recognized principles of the common law to the complicated jurisdiction of our State and Federal Government. Similar contracts in any State in the Union are now, by common or statute law, null and void."[20]

It is noteworthy that the body of state jurisprudence which formed the model for the Sherman Act coexisted with state laws permitting regulated industries to operate under governmental control in the public interest. Indeed, state regulatory laws long antedated the passage of the Sherman Act and had, prior to its passage, been upheld by this Court against constitutional attack.[21] Such laws were an integral part of state efforts to regu-

---

[19] *Id.*, at 2460.

[20] *Id.*, at 2456.

[21] See *Munn* v. *Illinois,* 94 U. S. 113, 125 ("Under [the police] powers the government regulates the conduct of its citizens one towards another, and the manner in which each shall use his own property, when such regulation becomes necessary for the public good. In their exercise it has been customary in England from time immemorial, and in this country from its first colonization, to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, innkeepers, &c., and in so doing to fix a maximum of charge to be made for services rendered, accommodations furnished, and articles sold. To this day, statutes are to be found in many of the States upon some or all these subjects; and we think it has never yet been successfully contended that such legislation came within any of the constitutional prohibitions against interference with private property").

late competition to which Congress turned for guidance in barring restraints of interstate commerce, and it is clear that those laws were left undisturbed by the passage of the Sherman Act in 1890. For, as congressional spokesmen expressly stated, there was no intent to "interfere with" state laws regulating domestic commerce or "invade the legislative authority of the several States. . . ."

As previously noted, the intent of the draftsmen of the Sherman Act not to intrude on the sovereignty of the States was coupled with a full and precise understanding of the narrow scope of congressional power under the Commerce Clause, as it was then interpreted by decisions of this Court. Subsequent decisions of the Court, however, have permitted the "jurisdictional" reach of the Sherman Act to expand along with an expanding view of the commerce power of Congress. See *Hospital Building Co.* v. *Rex Hospital Trustees,* 425 U. S. 738, 743 n. 2, and cases cited therein. These decisions, based on a determination that Congress intended to exercise all the power it possessed when it enacted the Sherman Act,[22] have in effect allowed the Congress of 1890 the retroactive benefit of an enlarged judicial conception of the commerce power.[23]

It was this retroactive expansion of the jurisdictional reach of the Sherman Act that was in large part responsible for the advent of the *Parker* doctrine. *Parker* involved a program regulating the production of raisins

---

[22] *E. g., United States* v. *Frankfort Distilleries,* 324 U. S. 293, 298; *United States* v. *Underwriters Assn.,* 322 U. S. 533, 558; *Atlantic Cleaners & Dyers* v. *United States,* 286 U. S. 427, 435. See also *United States* v. *American Bldg. Maint. Industries,* 422 U. S. 271, 278; *Gulf Oil Corp.* v. *Copp Paving Co.,* 419 U. S. 186, 194–195.

[23] See *Hospital Building Co.* v. *Rex Hospital Trustees,* 425 U. S., at 743 n. 2; *Gulf Oil Corp.* v. *Copp Paving Co., supra,* at 201–202; *Mandeville Island Farms* v. *American Crystal Sugar Co.,* 334 U. S. 219, 229–235.

within the State of California. Under the original understanding of the draftsmen of the Sherman Act, such in-state production, like in-state manufacturing, would not have been subject to the regulatory power of Congress under the Commerce Clause and thus not within the "jurisdictional" reach of the Sherman Act. See *United States* v. *E. C. Knight Co.*, 156 U. S. 1. If the state of the law had remained static, the *Parker* problem would rarely, if ever, have arisen. As stated in *Northern Securities Co.* v. *United States*, 193 U. S. 197, the operative premise would have been that the "Anti-Trust Act . . . prescribe[d] . . . a *rule* for *interstate and international* commerce, (not for domestic commerce,)" *id.*, at 337. The relevant question would have been whether the anticompetitive conduct required or permitted by the state statute was in restraint of domestic or interstate commerce. If the former, the conduct would have been beyond the reach of the Sherman Act; if the latter, the conduct would probably have violated the Sherman Act, regardless of contrary state law, on the theory that "[n]o State can, by . . . any . . . mode, project its authority into other States, and across the continent, so as to prevent Congress from exerting the power it possesses under the Constitution over interstate and international commerce, or . . . to exempt its corporation engaged in interstate commerce from obedience to any rule lawfully established by Congress for such commerce." *Id.*, at 345–346.

But the law did not remain static. As one commentator has put it: "By 1942, when *Parker v. Brown* was decided, the interpretation and scope of the commerce clause had changed substantially. With the development of the 'affection doctrine' purely intrastate events"—like state-mandated anticompetitive arrangements with respect to in-state agricultural production or in-state provision of utility services—"could be regulated

under the commerce clause if these events had the requisite impact on interstate commerce."[24]   This development created a potential for serious conflict between state statutes regulating commerce which, in 1890, would have been considered "domestic" but which, in 1942, were viewed as falling within the jurisdictional reach of the Sherman Act.   To have held that state statutes requiring anticompetitive arrangements with respect to such commerce were pre-empted by the Sherman Act would, in effect, have transformed a generous principle of judicial construction—namely the "retroactive" expansion of the jurisdictional reach of the Sherman Act to the limits of an expanded judicial conception of the commerce power—into a transgression of the clearly expressed congressional intent not to intrude on the regulatory authority of the States.

The "state action" doctrine of *Parker* v. *Brown,* as clarified by *Goldfarb,* represents the best possible accommodation of this limiting intent and the post-1890 judicial expansion of the jurisdictional reach of the Sherman Act.   *Parker's* basic holding—that the Sherman Act did not intend to displace restraints imposed by the State acting as sovereign—coincides with the expressed legislative goal not to "invade the legislative authority of the several States . . . ."   *Goldfarb* clarified *Parker* by holding that private conduct, if it is to come within the state-action exemption, must be not merely "prompted" but "compelled" by state action.   Thus refined, the doctrine performs the salutary function of isolating those areas of state regulation where the State's sovereign interest is, by the State's own judgment, at its strongest, and limits the exemption to those areas.[25]

---

[24] Slater, *supra,* n. 14, at 85.

[25] MR. JUSTICE BLACKMUN expresses the view that the Court answered the question of "what was to be the result if the expanding

Beyond this the Court cannot go without disregarding the purpose of the Sherman Act not to disrupt state regulatory laws.[26] Congress, of course, can alter its

---

ambit of the Sherman Act should bring it into conflict with inconsistent state law" in *Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U. S. 384, and that the answer it gave was that *any* state regulatory statute "inconsistent" with the judicially expanded Sherman Act was pre-empted. *Ante,* at 606. But the opinion in *Schwegmann*—which did not purport to modify or overrule *Parker*—is most plausibly read as resting on a post-1890 expression of congressional intent, the Miller-Tydings Act. See *infra,* at 639. Even assuming, however, that *Schwegmann* conflicted with *Parker,* then surely the most significant aspect of that conflict is that Congress did not allow it to persist, as *Schwegmann* was soon legislatively overruled by the enactment of the McGuire bill, 66 Stat. 632, 15 U. S. C. §§ 45 (a) (2)–(5).

[26] The Court states at one point that the omission of a "direct reference to light bulbs" in the statute creating the Michigan Public Service Commission indicates that the State's policy is "neutral on the question whether a utility should, or should not, have such a program." *Ante,* at 584, 585. This statement seems to suggest that the Court considers the specificity with which a state legislature deals with particular regulatory matters to be relevant in determining whether agency action respecting such matters represents a sovereign choice, entitled to deference under the Sherman Act.

This suggestion overlooks the fact that Michigan's policy, far from being "neutral," is, as announced in Mich. Comp. Laws § 460.6 (1970), to vest an expert agency "with complete power and jurisdiction to regulate all public utilities in the state . . . ." That agency is "vested with power and jurisdiction to regulate all rates, fares, fees, charges, *services,* rules, *conditions of service* and all other matters pertaining to the formation, operation or direction of such public utilities. It is further granted the power and jurisdiction to hear and pass upon all matters pertaining to or necessary or incident to such regulation of all public utilities, including electric light and power companies . . . ." *Ibid.* (emphasis added).

If a state legislature can ensure antitrust exemption only by eschewing such broad delegation of regulatory authority and incorporating regulatory details into statutory law, then there is a very great risk that the State will be prevented from regulating

original intent and expand or contract the categories of state law which may permissibly impose restraints on competition. For example, in 1937 Congress passed the Miller-Tydings Act which attached a proviso to § 1 of the Sherman Act permitting resale price maintenance contracts where such contracts were permitted by applicable state law. This proviso was interpreted in *Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U. S. 384, not to permit a State to enforce a law providing that *all* retailers within a State were bound by a resale price maintenance contract executed by any one retailer in the State. As the Court today notes, *Parker*—and the legislative judgment embodied in the 1890 version of the Sherman Act—would, standing alone, have seemed to immunize the state scheme. *Ante,* at 593. But Congress was thought to have struck a new balance in 1937 with respect to a specific category of state-imposed restraints. Accordingly, the Court in *Schwegmann* determined congressional intent concerning the permissible limits of state restraints with respect to resale price maintenance by reference to the later, and more specific, expression of congressional purpose.[27]

---

effectively. For as this Court has repeatedly observed in another context, "[d]elegation . . . has long been recognized as necessary in order that the exertion of legislative power does not become a futility. . . . [T]he effectiveness of both the legislative and administrative processes would become endangered if [the legislature] were under the . . . compulsion of filling in the details beyond the liberal prescription [of requiring the making of 'just and reasonable' rates and regulating in the 'public interest'] here. Then the burdens of minutiae would be apt to clog the administration of the law and deprive the agency of that flexibility and dispatch which are its salient virtues." *Sunshine Anthracite Coal Co.* v. *Adkins,* 310 U. S. 381, 398.

[27] The decision in *Schwegmann* rested primarily on a detailed analysis of the legislative history of the Miller-Tydings Act. 341 U. S., at 390–395.

There has been no analogous alteration of the original intent regarding the area of state regulation at issue here. Indeed, to the extent subsequent congressional action is probative at all, it shows a continuing intent to defer to the regulatory authority of the States over the terms and conditions of in-state electric utility service. Thus, § 201 (a) of the Federal Power Act, 16 U. S. C. § 824 (a), provides in relevant part that "Federal regulation . . . [is] to extend only to those matters which are not subject to regulation by the States."

The Court's opinion simply ignores the clear evidence of congressional intent and substitutes its own policy judgment about the desirability of disregarding any facet of state economic regulation that it thinks unwise or of no great importance. In adopting this freewheeling approach to the language of the Sherman Act the Court creates a statutory simulacrum of the substantive due process doctrine I thought had been put to rest long ago. See *Ferguson* v. *Skrupa,* 372 U. S. 726.[28] For the Court's approach contemplates the selective interdiction of those anticompetitive state regulatory measures that are deemed not "central" to the limited range of regulatory goals considered "imperative" by the federal judiciary.

Henceforth, a state-regulated public utility company must at its peril successfully divine which of its countless and interrelated tariff provisions a federal court will ultimately consider "central" or "imperative." If it guesses wrong, it may be subjected to treble damages as a penalty for its compliance with state law.

---

[28] See Verkuil, State Action, Due Process and Antitrust: Reflections on *Parker* v. *Brown,* 75 Col. L. Rev. 328 (1975).