CITY OF GROTON et al.

v.

The CONNECTICUT LIGHT AND POWER COMPANY et al.

Civ. No. 15,609.

United States District Court,
D. Connecticut.

Aug. 22, 1978.

Charles F. Wheatley, Jr., Grace Powers Monaco, Washington, D. C., Richard N. Ziff, Norwich, Conn., James F. Brennan, Jr., Suisman, Shapiro, Wool & Brennan, New London, Conn., Robert P. Billings, Brian J. Farrell, Wallingford, Conn., Richard J. Duda, Jewett City, Conn., John P. Lyons, William O. Keene, Keene & Lyons, Norwalk, Conn., for plaintiffs.

Ralph C. Dixon, C. Duane Blinn, Palmer S. McGee, Jr., James R. McIntosh, Richard M. Reynolds, Albert Zakarian, James R. Etter, Day, Berry & Howard, Hartford, Conn., for defendants.

## RULING ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

BLUMENFELD, District Judge.

Six municipal entities of the State of Connecticut have brought an antitrust action against a group of affiliated companies that are engaged in the distribution and sale of electric power. The defendants Connecticut Light & Power Company ("CL&P") and the Hartford Electric Company ("Helco") are electric utility corporations operating within Connecticut. The defendant Northeast Utilities, Inc. ("Northeast") is a public utility holding company that owns all of the common stock of CL&P, Helco and the defendant Northeast Utilities Service Company ("Nusco"). Nusco is the service company for the affiliated group and provides financial planning and accounting services to the companies of the Northeast system.

CL&P and Helco generate, transmit and distribute electric power at retail. CL&P also sells power to wholesale customers, including the plaintiffs, for resale to retail consumers. The plaintiffs own and operate retail electric distribution systems. According to the complaint, three plaintiffs depend upon CL&P for all the electric power they sell and distribute to their retail customers. (Complaint ¶ 7). Three plaintiffs own generating plants and supply a portion of their own electric power needs.

In 1963 CL&P executed service contracts with each of the plaintiffs to sell them electric power for resale by the municipals to their retail customers. See Exhibits 5, 6, 7, 8, 9 and 10 to Defendants' Motion for Partial Summary Judgment ("Exhibit(s)"). Each contract, setting forth the rates and conditions of service to the plaintiffs, was for a term of ten years. Each agreement was subject to cancellation by either party on three years' notice given on or after June 1, 1970.

In 1967 following lengthy negotiations between CL&P and plaintiffs regarding reduction in wholesale rates charged to the municipals, plaintiffs (through their Association, The Connecticut Municipal Electric and Gas Association) filed a formal complaint with the Federal Power Commission ("FPC") (now the Federal Energy Regulatory Commission ("FERC"))[1] alleging that the rates charged by CL&P to the plaintiffs were "unlawful." (FPC Docket No. E–7341). See Exhibit 13.[2]

After a series of negotiation conferences, CL&P agreed to a modification of the original service agreements. The plaintiffs and CL&P entered into a Memorandum of Settlement, see Exhibit 14, and appropriate amendments were made to the existing

[1]. On October 1, 1977, pursuant to the provisions of the Department of Energy Organization Act, Public Law 95–91, 91 Stat. 565 (August 4, 1977) and Executive Order No. 12009, 42 Fed.Reg. 46267 (September 15, 1977), the Federal Power Commission ceased to exist and its functions and regulatory responsibilities were transferred to the Secretary of Energy and the Federal Energy Regulatory Commission.

[2]. In 1964 as a result of the Supreme Court's decision in *Federal Power Comm'n v. Southern California Edison Co.* (also *City of Colton v. Southern California Edison Co.*), 376 U.S. 205, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964), the FPC assumed jurisdiction over CL&P's rates for wholesale sales of electric power. The FPC reviewed the rates, suggested certain changes and accepted them for filing with the Commission.

agreements. Thereafter, the plaintiffs withdrew their FPC complaint.

In 1971 after protracted negotiations on the terms of a new contract proved unsuccessful, CL&P sent notice of termination to the plaintiffs pursuant to the provisions of the amended agreement.[3] Pursuant to this notice, the contract agreements were terminated on January 16, 1973. Service to the plaintiffs continued under Resale Service Rate Schedule–1 ("R–1") which went into effect the same day. Plaintiffs filed this lawsuit on February 13, 1973.

In June 1972, CL&P had filed with the FPC a proposed tariff, R–1, setting forth the rates and conditions of service to the plaintiffs. See Exhibit 1a. On July 28, 1972, the plaintiffs petitioned the Commission to intervene in opposition to the filed rates (FPC Docket No. E–7743); and by its order dated August 14, 1972, the Commission accepted the tariff for filing and suspended its effective date for five months until January 16, 1973, at which time CL&P was authorized to collect the increased rate subject to refund.[4] See 16 U.S.C. § 824d(e); Exhibit 1b. Thereafter a hearing was held before the Commission's administrative law judge. On July 29, 1974, the administrative law judge filed his decision. See Exhibit 17a. That decision was appealed to the entire Commission; and on April 28, 1976, the FPC rendered its opinion and order, modifying in part the decision of the administrative law judge. See Exhibit 17b. An appeal from the Commission order is now pending before the District of Columbia Court of Appeals.

In August 1974, CL&P filed with the FPC Resale Service Rate Schedule–2 ("R–2") which became effective on September 1, 1974. The plaintiffs again petitioned the FPC to intervene in opposition to those filed rates. Pursuant to a negotiated settlement, plaintiffs withdrew their complaint concerning the R–2 schedule. On December 1, 1975, CL&P filed the Resale Service Rate Schedule–3 ("R–3"). Plain-

tiffs intervened in the FPC proceeding in opposition to the R–3 schedule. The matter is now pending before the FPC. The plaintiffs currently purchase power under the rates and conditions contained in the R–3 schedule.

On November 12, 1971, the New England Power Pool (NEPOOL) Agreement, dated September 2, 1971, was filed with the FPC. See Exhibit 4. The agreement provides for interconnected and coordinated operation among electric utilities in the New England region, and participation is open to any entity engaged in the electric utility business. In March 1972, the plaintiffs petitioned to intervene in the FPC proceeding and moved to reject the NEPOOL Agreement. See Exhibits 20a and 20b. The petition to intervene was granted in September 1972, and the plaintiffs presented their claims at hearings before the administrative law judge. On November 24, 1975, the judge issued his decision finding that the NEPOOL Agreement, as amended and supplemented, is reasonable and nondiscriminatory. See Exhibit 21.

In their complaint plaintiffs charge violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and section 2(a) of the Clayton Act, 15 U.S.C. § 13(a). They contend that certain provisions contained in the service contracts between themselves and CL&P violated the federal antitrust laws. More specifically, plaintiffs claim that alternate sources of bulk power were not available to them because the contracts contained unreasonable economic penalties for plaintiffs' increasing their generating capacities or purchasing power from other sources. In addition, it is their contention that alternate sources of power were foreclosed by defendants' refusal to "wheel" power from other wholesale electric suppliers to plaintiffs' power systems.

Plaintiffs also complain that they were prevented from competing in certain retail and wholesale markets by defendants' con-

---

**3.** An amendment to the original agreement shortened the time for notice from three years to one year.

**4.** The R–1 rate schedule continued in effect until September 1, 1974.

tract restrictions on the end use of power supplied to the plaintiffs. Under the terms of the service contract, plaintiffs were prohibited from selling the power for resale, and they were also not permitted to sell the power at retail beyond their corporate limits. Plaintiffs contend further that defendants shut them out of the retail industrial market by establishing retail industrial rates at such unreasonably low and discriminatory levels that the plaintiffs were unable to compete for retail industrial load.

Defendants move for summary judgment on four grounds. They contend:

1) insofar as plaintiffs predicate their claim for damages upon defendants' resale service rate schedules and the NEPOOL rate agreement, the court lacks subject matter jurisdiction because the Federal Energy Regulatory Commission has exclusive jurisdiction over such matters;

2) insofar as plaintiffs claim defendants' activities violate section 1 of the Sherman Act, 15 U.S.C. § 1, defendants are entitled to judgment because, as corporate components of one public utility holding company,

as a matter of law, defendants are incapable of combining and conspiring to violate the antitrust laws;

3) insofar as plaintiffs' damage action is based on territorial limitations contained in contracts between the plaintiffs and the defendants, the court lacks subject matter jurisdiction over such claims, because the limitations that merely restate restrictions imposed on plaintiffs by state statute are beyond the reach of the antitrust laws; and

4) insofar as plaintiffs' cause of action is based upon acts of the defendants that occurred prior to February 13, 1969, the action is barred by the four-year statute of limitations. 15 U.S.C. § 15b.

### Exclusive Jurisdiction

Section 205 of the Federal Power Act ("FPA") vests in the Federal Energy Regulatory Commission the authority to pass upon the reasonableness of the structure, terms and conditions pertaining to the sale and distribution of wholesale electric rates and charges.[5] Defendants contend that in

---

5. Section 205 of the Federal Power Act is codified in 16 U.S.C. § 824d:

"(a) All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

"(b) No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference ·in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

"(c) Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all

contracts which in any manner affect or relate to such rates, charges, classifications, and services.

"(d) Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

"(e) Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the

creating an extensive regulatory scheme for rate-making, Congress intended that any anticompetitive results brought about by provisions contained in wholesale rate schedules be exempt from the application of the antitrust laws. After the Supreme Court's decision in *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), "there can be little doubt about the proposition that the federal antitrust laws are applicable to electric utilities." *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 596 n. 35, 96 S.Ct. 3110, 3120, 49 L.Ed.2d 1141 (1976). With the Court's ruling that the FPA is not sufficiently pervasive to create a total exemption from the antitrust laws, the District Courts are now left to a particularized inquiry whether application of the antitrust laws is warranted. In divining an appropriate standard the starting point for analysis must be the Supreme Court's prescription in *United States v. Philadelphia Bank,* 374 U.S. 321, 350–51, 83 S.Ct. 1715, 1734–35, 10 L.Ed.2d 915 (1963): "Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions." (Footnotes omitted). The Court refined the holding of *Philadelphia Bank* in *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). In *Silver,* the New York Stock Exchange had ordered its member firms to remove private direct telephone wire connections between their offices and the nonmember office of Silver, who was given neither notice nor a hearing. Silver commenced an antitrust action that challenged the Exchange conduct as an unlawful group boycott by members of the Exchange. The Exchange had acted pursuant to a provision of its rules that it could require discontinuance of wire service between the offices of a member and a nonmember at any time. The Supreme Court noted that the Congress had not expressly exempted the Exchange rules from the antitrust laws and concluded that the regulatory scheme under the Act was not sufficiently pervasive to create an implied total exemption from the Sherman Act. Yet in view of the extensive scheme of self-regulation, the Court acknowledged that there had been some repeal, *id.* at 360–61, 83 S.Ct. at 1258–59, but "only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary." *Id.* at 357, 83 S.Ct. at 1257. Because the Commission had no jurisdiction to review particular instances of enforcement of the exchange rules, the Court found that antitrust immunity was not "necessary to make the . . . Act work." The Court noted that the lack of jurisdiction removed any problem of conflict or coextensiveness of coverage with the agency's regulatory power.

decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible."

"There is nothing built into the regulatory scheme which performs the antitrust function of insuring that an exchange will not in some cases apply its rules so as to do injury to competition which cannot be justified as furthering the legitimate self-regulative ends."

*Id.* at 358, 83 S.Ct. at 1258.

Then in *Gordon v. New York Stock Exchange, Inc.,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), the Court again focused on the potential for conflict with a self-regulating scheme and amplified the *Silver* Court's "necessary-to-make-the-act-work" test. In *Gordon,* investors challenged the practice, reflected in New York Stock Exchange rules, of stock brokers fixing their commissions charges. Under § 19(b) of the Securities Exchange Act of 1934, the SEC was empowered to alter exchange rules relating to the fixed commission rates. The Court immunized the challenged behavior from antitrust attack. In reaching the result, the Court noted that the SEC had a history of closely supervising commission charges. In view of the SEC's power to alter exchange rules in the future, the SEC performed the antitrust function at the agency level. The Court declined to take evidence on whether the fixed commissions *themselves* were necessary to achieve the regulatory function of the SEC. Rather the Court found that exclusive jurisdiction was necessary to make the regulatory act work.

In *Gordon* the Court found that "to deny antitrust immunity with respect to commission rates would be to subject the exchanges and their members to conflicting standards." *Id.* at 689, 95 S.Ct. at 2614. If the antitrust court were to impose different requirements upon exchange members, they might find themselves unable to conduct business without violation of either a court order or the SEC rules. The longstanding supervisory power of the SEC over commission rates caused the Court to conclude that to permit antitrust judicial forums throughout the country to pass on the commission rate scheme would run counter to the regulatory procedures authorized by the Congress rather than supplement that scheme. *Id.* at 690, 95 S.Ct. 2598. Faced with the collision of antitrust enforcement and a federal regulatory scheme, the Court concluded that Congress intended the SEC to safeguard competition in the securities market.

The focus on the imposition of conflicting standards was reaffirmed in *Cantor v. Detroit Edison Co., supra.* In *Cantor* the Michigan Public Works Service Commission had approved as part of a rate schedule a marketing practice of supplying its customers with 50% of the standard-sized light bulbs routinely used in the home. A retail druggist selling light bulbs challenged the practice as unlawful use of monopoly power in the sale of electricity to restrain competition in the sale of light bulbs. In striking down the light bulb program, the Court ruled that state regulation of defendant's distribution of electricity posed no necessary conflict with the federal requirement that defendant's activities in competitive markets conform to antitrust standards.

Although *Cantor* involved an exemption arguably created through state regulation rather than federal regulation, I am persuaded that much of the reasoning in that case controls the exclusive jurisdiction claim pressed by the defendants in the present action. Defendants argue that Congress intended the application of the antitrust principles to rate schedules only within the federal regulatory scheme it established under the Federal Power Act. They contend that because Congress created an extensive regulatory mechanism to establish electric power rates and conditions of service and this scheme clearly intended that factors other than free competition were to be considered by the FERC in reviewing the tariff schedules, it would be inconsistent with congressional intent to permit plaintiffs to seek review of the rate schedules in an antitrust forum. Defendants argue that jurisdiction over ratemaking rests with the FERC and not only does the statutory scheme give the Commission the authority to pass upon the reasonableness of rates but also the power to fix rates when those submitted by the regulated util-

ity are determined to be unjust or unreasonable. See 16 U.S.C. § 824e.[6] Because the Commission has the power to fix rates, the defendants urge that the ratemaking function of the FERC is analogous to the SEC regulation over brokerage commissions which was found to be exempt from the antitrust laws in *Gordon.*

But the present case is not one in which the utility is caught between the requirements of federal regulation and the strictures of the antitrust laws. Here as in *Cantor* the ratemaking process "involved a mixture of private and public decisionmaking." *Cantor v. Detroit Edison Co., supra,* 428 U.S. at 593, 96 S.Ct. at 3119. Any change in electric power rates or conditions of service originates with the regulated utility's submission of a proposed "tariff."

The FERC regulations provide that the tariff schedules submitted by the utility:

"shall be in writing and may take the physical form of a contractual document, purchase or sale agreement, lease of facilities, tariff or other writing. Any oral agreement or understanding forming a part of such statement shall be reduced to writing and made a part thereof."

18 C.F.R. § 35.2(b) (footnote omitted). It seems clear that what the Commission envisioned in adopting this regulation was that the utility would first consider the rates and conditions of service in the context of a commercial agreement with an intended purchaser of electric power. Having made

certain judgments based upon the practicalities of a commercial relationship and reduced these to proposed contract terms, the utility would then submit the "tariff" to the Commission for its review. In noting that the underlying commercial relationship between public utilities and their customers militated against antitrust immunity, the Court in *Otter Tail Power Co., supra,* 410 U.S. at 374, 93 S.Ct. at 1028, stated:

"It is clear . . . that Congress rejected a pervasive regulatory scheme for controlling the interstate distribution of power in favor of voluntary commercial relationships. When these relationships are governed in the first instance by business judgment and not regulatory coercion, courts must be hesitant to conclude that Congress intended to override the fundamental national policies embodied in the antitrust laws."

In the present case, the rate structure and practices challenged by the plaintiffs are not the product of "regulatory coercion." The terms and conditions are in the first instance the product of the regulated utility. Although the defendants' tariffs are reviewed and in many instances modified by the FERC, defendants exercise sufficient freedom of choice concerning the contents of the rate schedules to require them to take responsibility for the harmful consequences, if any, of their conduct.[7] See *Cantor v. Detroit Edison Co., supra,* 428 U.S. at 593, 96 S.Ct. 3110; *City of Mishawa-*

---

**6.** Title 16, § 824e of the United States Code provides:

"(a) Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.

"(b) The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to

the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy."

**7.** See *City of Shakopee v. Northern States Power Co.,* Civ. No. 4–75–591 (D.Minn.1976) where Judge Lord interpreted *Cantor* to hold:

"If an anticompetitive practice is the product, at least in part, of the company being regulated and could be avoided if the company chose to do so, then the anticompetitive condition is in reality the work of that company and is not 'necessary' to the functioning of the regulatory scheme and will not be immunized from antitrust liability." (mem. op. 6.)

ka, *Indiana v. Indiana and Michigan Electric Co.*, 560 F.2d 1314 (7th Cir. 1977), *cert. denied,* 436 U.S. 922, 98 S.Ct. 2274, 56 L.Ed.2d 765 (1978).

Moreover, as noted earlier, an antitrust exemption even when appropriate is to be narrowly drawn. *Gordon v. New York Stock Exchange, supra.* The defendants request summary judgment as to claims concerning "the structure, terms and conditions of rates in the 1963 rate schedule contract and the R–1, R–2, R–3 and the NEPOOL rate schedules." The FERC regulations require that the rate schedule filed by the utility with the Commission set forth:

> "all rates and charges for any transmission or sale of electric energy subject to the jurisdiction of this Commission, the classifications, practices, rules and regulations affecting such rates and charges and all contracts which in any manner affect or relate to such rates, charges, classifications, services, rules, regulations or practices . . . ."

18 C.F.R. § 35.1(a). The exemption the defendants urge in the present case sweeps far too broadly. All conduct relating to the sale or distribution of wholesale electric power cannot be insulated from antitrust standards merely because the rate or practice must be included in a rate schedule filed with the Commission.[8] The plaintiffs have alleged 28 antitrust violations in their complaint. The defendants do not state which of these violations are related to the tariff schedules and which claims now asserted have been passed upon by the Commission. Antitrust laws are not inapplicable to anticompetitive conduct simply because a federal agency has jurisdiction over one or more of the defendants' activities. *United States v. Philadelphia National Bank, supra; Pan American World Airways v. United States,* 371 U.S. 296, 305, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963); *California v. Federal Power Commission,* 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962). Therefore, while the existence of agency regulation over a particular practice is a *sine qua non* to a finding of exclusive jurisdiction, the mere fact of regulation is not a sufficient predicate for such a finding.[9]

### Plaintiffs' Section 1 Claims

Defendants move for summary judgment on all claims based upon section 1 of the Sherman Act, 15 U.S.C. § 1, and assert that because they are corporate components of one public utility holding company, as a matter of law, they are incapable of combining or conspiring to violate the antitrust laws. The substance of defendants' argument is that although the various components of the Northeast system are separately incorporated, they operate as a single business unit and the anticompetitive conspiracy charged by the plaintiffs is merely the result of normal business hazards. See *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 474, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (Harlan, J., dissenting).

The position that defendants advance, whether meritorious or not, ignores a feature of plaintiffs' case which precludes summary judgment on the section 1 claims. The section 1 claims pressed by the plaintiffs arise, in part, from provisions contained in sale and distribution agreements between the plaintiffs and defendant CL&P. The plaintiffs argue that the com-

---

**8.** *Cf. Gordon v. New York Stock Exchange, Inc., supra,* where the Court held the very limited practice of fixed brokerage fees to be within the exclusive jurisdiction of the SEC and therefore exempt from the antitrust laws.

**9.** Defendants also argue that because the Commission considered the anticompetitive consequences of provisions contained in the rate schedules an exemption from yet a "second" de novo review of the matter is warranted. In *California v. Federal Power Commission,* 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962), the Court held that even though the agency had taken the competitive factors into account in passing upon a merger application an exemption was not appropriate. *Id.* at 484–85, 82 S.Ct. 901. In the present action as in *California* and *Philadelphia Bank, supra,* 374 U.S. at 351–52, 83 S.Ct. 1715, although the agency was required and did consider the anticompetitive consequences, it was not required to give this factor any particular weight and the regulatory act does not provide any specific judicial review of the agency's "antitrust" ruling.

mercial interaction between themselves and CL&P satisfies the jurisdictional requirements of a section 1 conspiracy.

 The Supreme Court has held that an antitrust plaintiff may charge a conspiracy or combination to restrain trade based upon that plaintiff's unwilling compliance with anticompetitive provisions of a contract or agreement between himself and a defendant, *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 142, 88 S.Ct. 1981, 1986, 20 L.Ed.2d 982 (1968) ("In any event each petitioner can clearly charge a combination between Midas and himself, as of the day he unwillingly complied with the restrictive franchise agreements."); *Albrecht v. Herald Co.*, 390 U.S. 145, 150 n. 6, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), for the antitrust laws "were enacted 'for the protection of *competition*, not *competitors*,'" *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), quoting from *Brown Shoe Co. v. United States*, 370 U.S. 294, 329, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) (emphasis in the original). Plaintiffs' papers in opposition to this motion contain allegations that they objected to, and resisted, the alleged anticompetitive provisions contained in contracts and rate and service agreements.[10] Plaintiffs have under this theory alleged sufficient specific facts to apprise the defendants of the nature of the combination and conspiracy charged as violations of section 1, and to present a triable issue of fact that precludes summary judg-

ment at this time. See *Poller v. Columbia Broadcasting System, supra.*[11]

*Claims Concerning Territorial Limitations*

The plaintiffs' complaint charges violations of the federal antitrust laws arising from provisions in contracts between plaintiffs and CL&P that prohibited plaintiffs from reselling power at retail beyond their corporate limits. The defendants argue that because this contract term merely restated restrictions imposed on the plaintiffs by state statute that the territorial limitation may not be the basis for an antitrust action.[12] Accordingly, they request summary judgment on the territorial restriction claim.

 The defendants do not contend that the territorial restriction provision is exempt from antitrust purview under the Supreme Court's ruling in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The rule in *Parker* would not immunize defendants' conduct for, as the Court noted in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 791, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1975), the defendants' "anticompetitive activities must be compelled by direction of the State acting as a sovereign" for the "state action" exemption to apply. See *Cantor v. Detroit Edison Co., supra*, 428 U.S. at 592–93, 96 S.Ct. 3110; *Schwegmann Brothers v. Calvert Distillers Corp.*, 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed.

---

**10.** The record clearly reflects that plaintiffs voiced their opposition to the rates and conditions contained in the service agreements, and indeed, petitioned the Commission to intervene in the Commission proceedings in opposition to the tariff schedules.

**11.** Defendants assert that they may be legally incapable of combining or conspiring within the meaning of section 1 of the Sherman Act if they operate as a single business entity. See *DuPont Glore Forgan Inc. v. Am. Tel. & Tel. Co.*, 437 F.Supp. 1104 (S.D.N.Y.1977) and cases cited therein. Facts adduced at trial may shed additional light on the unity of defendants' operations and foreclose the admission of evidence concerning illegal activity between any two of them.

**12.** Specifically, Chapter 101, § 7–213 of the Connecticut General Statutes outlines the general authorization provisions concerning municipal electric systems:

"Any municipality may, under the limitations of this chapter, construct, purchase, lease or establish and maintain one or more plants for the manufacture and distribution of gas or electricity for furnishing light for municipal use and for use of such of its inhabitants as may require and pay for the same."

And also Conn.Gen.Stats. § 7–220:

"Any municipality having obtained a plant for the purpose, under the authority of this chapter, may manufacture, generate and distribute gas or electricity for furnishing light for municipal purposes or for the use of the inhabitants . . . ."

1035 (1951).[13] Rather defendants argue that because of the existence of the state statutory provisions plaintiffs could not legally sell electric power at retail beyond their corporate limits, and therefore could not have suffered economic harm stemming from the defendants' contract provision. As the District of Columbia Court of Appeals noted, however, in *City of Huntingburg, Indiana v. Federal Power Commission*, 162 U.S.App.D.C. 236, 245, 498 F.2d 778, 787 (1974), there exists a distinction between contractual disabilities of fixed duration and statutory or regulatory restrictions of indefinite applicability. The anticompetitive effects of the territorial restrictions in the service agreements are to be evaluated without regard to the legal limitations contained in the Connecticut statutes.

One final point raised by the defendants in this motion is that the plaintiffs are limited to recovery of damages for those injuries occurring within the four years prior to the commencement of the present action. There is no reason to rule on this issue on a motion for summary judgment as the matter may be resolved through a pretrial order that determines what evidence on the damage question will be admissible in the trial on the merits.

From what appears above it is apparent that this case, as is usual in antitrust litigation, does not lend itself to disposition by summary judgment. Therefore, defendants' Motion for Summary Judgment is denied and it is

SO ORDERED.

---

**13.** *Cf. Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 413, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), where the Court refused to extend the *Parker* doctrine to insulate the conduct of a municipal electric utility company holding that anticompetitive conduct engaged in as an act of government by a state sovereign may only be exempt from the antitrust laws where the conduct was undertaken pursuant to state policy to displace competition with regulation or monopoly public service.